(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PLUMHOFF ET AL. *v.* RICKARD, A MINOR CHILD, INDIVIDUALLY, AND AS SURVIVING DAUGHTER OF RICKARD, DECEASED, BY AND THROUGH HER MOTHER RICKARD, AS PARENT AND NEXT FRIEND

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 12–1117.  Argued March 4, 2014—Decided May 27, 2014

Donald Rickard led police officers on a high-speed car chase that came to a temporary halt when Rickard spun out into a parking lot.  Rickard resumed maneuvering his car, and as he continued to use the accelerator even though his bumper was flush against a patrol car, an officer fired three shots into Rickard's car.  Rickard managed to drive away, almost hitting an officer in the process.  Officers fired 12 more shots as Rickard sped away, striking him and his passenger, both of whom died from some combination of gunshot wounds and injuries suffered when the car eventually crashed.

  Respondent, Rickard's minor daughter, filed a 42 U. S. C. §1983 action, alleging that the officers used excessive force in violation of the Fourth and Fourteenth Amendments.  The District Court denied the officers' motion for summary judgment based on qualified immunity, holding that their conduct violated the Fourth Amendment and was contrary to clearly established law at the time in question.  After finding that it had appellate jurisdiction, the Sixth Circuit held that the officers' conduct violated the Fourth Amendment.  It affirmed the District Court's order, suggesting that it agreed that the officers violated clearly established law.

*Held*:

  1. The Sixth Circuit properly exercised jurisdiction under 28 U. S. C. §1291, which gives courts of appeals jurisdiction to hear appeals from "final decisions" of the district courts.  The general rule

that an order denying a summary judgment motion is not a "final de-cision[n]," and thus not immediately appealable, does not apply when it is based on a qualified immunity claim. *Johnson* v. *Jones*, 515 U. S. 304, 311. Respondent argues that *Johnson* forecloses appellate jurisdiction here, but the order in *Johnson* was not immediately ap-pealable because it merely decided "a question of 'evidence sufficien-cy,'" *id.*, at 313, while here, petitioners' qualified immunity claims raise legal issues quite different from any purely factual issues that might be confronted at trial. Deciding such legal issues is a core re-sponsibility of appellate courts and does not create an undue burden for them. See, *e.g.*, *Scott* v. *Harris*, 550 U. S. 372. Pp. 5–7.

2. The officers' conduct did not violate the Fourth Amendment. Pp. 7–15.

(a) Addressing this question first will be "beneficial" in "devel-op[ing] constitutional precedent" in an area that courts typically con-sider in cases in which the defendant asserts a qualified immunity defense, *Pearson* v. *Callahan*, 555 U. S. 223, 236. Pp. 7–8.

(b) Respondent's excessive-force argument requires analyzing the totality of the circumstances from the perspective "of a reasonable of-ficer on the scene." *Graham* v. *Connor*, 490 U. S. 386, 396. Respond-ent contends that the Fourth Amendment did not allow the officers to use deadly force to terminate the chase, and that, even if they were permitted to fire their weapons, they went too far when they fired as many rounds as they did. Pp. 8–12.

(1) The officers acted reasonably in using deadly force. A "po-lice officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott, supra*, at 385. Rickard's outra-geously reckless driving—which lasted more than five minutes, ex-ceeded 100 miles per hour, and included the passing of more than two dozen other motorists—posed a grave public safety risk, and the rec-ord conclusively disproves that the chase was over when Rickard's car came to a temporary standstill and officers began shooting. Un-der the circumstances when the shots were fired, all that a reasona-ble officer could have concluded from Rickard's conduct was that he was intent on resuming his flight, which would again pose a threat to others on the road. Pp. 9–11.

(2) Petitioners did not fire more shots than necessary to end the public safety risk. It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, they need not stop shooting until the threat has ended. Here, during the 10-second span when all the shots were fired, Rickard never abandoned his attempt to flee and eventually managed to drive away.

Syllabus

A passenger's presence does not bear on whether officers violated Rickard's Fourth Amendment rights, which "are personal rights [that] may not be vicariously asserted." *Alderman* v. *United States*, 394 U. S. 165, 174. Pp. 11–12.

   3. Even if the officers' conduct had violated the Fourth Amendment, petitioners would still be entitled to summary judgment based on qualified immunity. An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "'clearly established'" at the time of the challenged conduct. *Ashcroft* v. *al-Kidd*, 563 U. S. ___, ___. *Brosseau* v. *Haugen*, 543 U. S. 194, 201, where an officer shot at a fleeing vehicle to prevent possible harm, makes plain that no clearly established law precluded the officer's conduct there. Thus, to prevail, respondent must meaningfully distinguish *Brosseau* or point to any "controlling authority" or "robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at ___, that emerged between the events there and those here that would alter the qualified-immunity analysis. Respondent has made neither showing. If anything, the facts here are more favorable to the officers than the facts in *Brosseau*; and respondent points to no cases that could be said to have clearly established the unconstitutionality of using lethal force to end a high-speed car chase. Pp. 12–15.

509 Fed. Appx. 388, reversed and remanded.

   ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, SOTOMAYOR, and KAGAN, JJ., joined, in which GINSBURG, J., joined as to the judgment and Parts I, II, and III–C, and in which BREYER, J., joined except as to Part III–B–2.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–1117

———————

OFFICER VANCE PLUMHOFF, ET AL., PETITIONERS *v.*
WHITNE RICKARD, A MINOR CHILD, INDIVIDUALLY, AND
AS SURVIVING DAUGHTER OF DONALD RICKARD,
DECEASED, BY AND THROUGH HER MOTHER
SAMANTHA RICKARD, AS PARENT AND
NEXT FRIEND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 27, 2014]

JUSTICE ALITO delivered the opinion of the Court.*

The courts below denied qualified immunity for police officers who shot the driver of a fleeing vehicle to put an end to a dangerous car chase. We reverse and hold that the officers did not violate the Fourth Amendment. In the alternative, we conclude that the officers were entitled to qualified immunity because they violated no clearly established law.

I

A

Because this case arises from the denial of the officers' motion for summary judgment, we view the facts in the light most favorable to the nonmoving party, the daughter

———————

*JUSTICE GINSBURG joins the judgment and Parts I, II, and III–C of this opinion. JUSTICE BREYER joins this opinion except as to Part III–B–2.

of the driver who attempted to flee. *Wilkie* v. *Robbins*, 551
U. S. 537, 543, n. 2 (2007). Near midnight on July 18,
2004, Lieutenant Joseph Forthman of the West Memphis,
Arkansas, Police Department pulled over a white Honda
Accord because the car had only one operating headlight.
Donald Rickard was the driver of the Accord, and Kelly
Allen was in the passenger seat. Forthman noticed an
indentation, "'roughly the size of a head or a basketball'"
in the windshield of the car. *Estate of Allen* v. *West Mem-
phis*, 2011 WL 197426, *1 (WD Tenn., Jan. 20, 2011). He
asked Rickard if he had been drinking, and Rickard re-
sponded that he had not. Because Rickard failed to pro-
duce his driver's license upon request and appeared nerv-
ous, Forthman asked him to step out of the car. Rather
than comply with Forthman's request, Rickard sped away.

Forthman gave chase and was soon joined by five other
police cruisers driven by Sergeant Vance Plumhoff and
Officers Jimmy Evans, Lance Ellis, Troy Galtelli, and
John Gardner. The officers pursued Rickard east on In-
terstate 40 toward Memphis, Tennessee. While on I–40,
they attempted to stop Rickard using a "rolling roadblock,"
*id.*, at *2, but they were unsuccessful. The District Court
described the vehicles as "swerving through traffic at high
speeds," *id.*, at *8, and respondent does not dispute that
the cars attained speeds over 100 miles per hour.[1] See
Memorandum of Law in Response to Defendants' Motion
for Summary Judgment in No. 2:05–cv–2585 (WD Tenn.),
p. 16; see also Tr. of Oral Arg. 54:23–55:6. During the

---

[1] It is also undisputed that Forthman saw glass shavings on the
dashboard of Rickard's car, a sign that the windshield had been broken
recently; that another officer testified that the windshield indentation
and glass shavings would have justified a suspicion "'that someone had
possibly been struck by that vehicle, like a pedestrian'"; and that
Forthman saw beer in Rickard's car. See App. 424–426 (Response to
Defendant's Statement of Undisputed Material Facts in No. 2:05–cv–
2585 (WD Tenn.), ¶¶15–19).

chase, Rickard and the officers passed more than two dozen vehicles.

Rickard eventually exited I–40 in Memphis, and shortly afterward he made "a quick right turn," causing "contact [to] occu[r]" between his car and Evans' cruiser. 2011 WL 197426, *3. As a result of that contact, Rickard's car spun out into a parking lot and collided with Plumhoff's cruiser. Now in danger of being cornered, Rickard put his car into reverse "in an attempt to escape." *Ibid.* As he did so, Evans and Plumhoff got out of their cruisers and approached Rickard's car, and Evans, gun in hand, pounded on the passenger-side window. At that point, Rickard's car "made contact with" yet another police cruiser. *Ibid.* Rickard's tires started spinning, and his car "was rocking back and forth," *ibid.*, indicating that Rickard was using the accelerator even though his bumper was flush against a police cruiser. At that point, Plumhoff fired three shots into Rickard's car. Rickard then "reversed in a 180 degree arc" and "maneuvered onto" another street, forcing Ellis to "step to his right to avoid the vehicle." *Ibid.* As Rickard continued "fleeing down" that street, *ibid.*, Gardner and Galtelli fired 12 shots toward Rickard's car, bringing the total number of shots fired during this incident to 15. Rickard then lost control of the car and crashed into a building. *Ibid.* Rickard and Allen both died from some combination of gunshot wounds and injuries suffered in the crash that ended the chase. See App. 60, 76.

B

Respondent, Rickard's surviving daughter, filed this action under Rev. Stat. §1979, 42 U. S. C. §1983, against the six individual police officers and the mayor and chief of police of West Memphis. She alleged that the officers used excessive force in violation of the Fourth and Fourteenth Amendments.

The officers moved for summary judgment based on

qualified immunity, but the District Court denied that motion, holding that the officers' conduct violated the Fourth Amendment and was contrary to law that was clearly established at the time in question. The officers appealed, but a Sixth Circuit motions panel initially dismissed the appeal for lack of jurisdiction based on this Court's decision in *Johnson* v. *Jones*, 515 U. S. 304, 309 (1995). Later, however, that panel granted rehearing, vacated its dismissal order, and left the jurisdictional issue to be decided by a merits panel.

The merits panel then affirmed the District Court's decision on the merits. *Estate of Allen* v. *West Memphis*, 509 Fed. Appx. 388 (CA6 2012). On the issue of appellate jurisdiction, the merits panel began by stating that a "motion for qualified immunity denied on the basis of a district court's determination that there exists a triable issue of fact generally cannot be appealed on an interlocutory basis." *Id.*, at 391. But the panel then noted that the Sixth Circuit had previously interpreted our decision in *Scott* v. *Harris*, 550 U. S. 372 (2007), as creating an "exception to this rule" under which an immediate appeal may be taken to challenge "'blatantly and demonstrably false'" factual determinations. 509 Fed. Appx., at 391 (quoting *Moldowan* v. *Warren*, 578 F. 3d 351, 370 (CA6 2009)). Concluding that none of the District Court's factual determinations ran afoul of that high standard, and distinguishing the facts of this case from those in *Scott*, the panel held that the officers' conduct violated the Fourth Amendment. 509 Fed. Appx., at 392, and n. 3. The panel said nothing about whether the officers violated *clearly established* law, but since the panel affirmed the order denying the officers' summary judgment motion,[2]

_____

[2] After expressing some confusion about whether it should dismiss or affirm, the panel wrote that "it would seem that what we are doing is affirming [the District Court's] judgment." 509 Fed. Appx., at 393.

the panel must have decided that issue in respondent's favor.

We granted certiorari. 571 U. S. ____ (2013).

## II

We start with the question whether the Court of Appeals properly exercised jurisdiction under 28 U. S. C. §1291, which gives the courts of appeals jurisdiction to hear appeals from "final decisions" of the district courts.

An order denying a motion for summary judgment is generally not a final decision within the meaning of §1291 and is thus generally not immediately appealable. *Johnson*, 515 U. S., at 309. But that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity. *Id.*, at 311; *Mitchell* v. *Forsyth*, 472 U. S. 511, 528 (1985). "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Pearson* v. *Callahan*, 555 U. S. 223, 231 (2009) (quoting *Mitchell*, *supra,* at 526). As a result, pretrial orders denying qualified immunity generally fall within the collateral order doctrine. See *Ashcroft* v. *Iqbal*, 556 U. S. 662, 671–672 (2009). This is so because such orders conclusively determine whether the defendant is entitled to immunity from suit; this immunity issue is both important and completely separate from the merits of the action, and this question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost. See *ibid*; *Johnson*, *supra*, at 311–312 (citing *Mitchell*, *supra*, at 525–527).

Respondent argues that our decision in *Johnson*, forecloses appellate jurisdiction under the circumstances here, but the order from which the appeal was taken in *Johnson* was quite different from the order in the present case. In *Johnson*, the plaintiff brought suit against certain police officers who, he alleged, had beaten him. 515 U. S., at

307.  These officers moved for summary judgment, assert-
ing that they were not present at the time of the alleged
beating and had nothing to do with it.  *Id.*, at 307–308.
The District Court determined, however, that the evidence
in the summary judgment record was sufficient to support
a contrary finding, and the court therefore denied the
officers' motion for summary judgment.  *Id.*, at 308.  The
officers then appealed, arguing that the District Court had
not correctly analyzed the relevant evidence.  *Ibid.*

This Court held that the *Johnson* order was not imme-
diately appealable because it merely decided "a question of
'evidence sufficiency,' *i.e.*, which facts a party may, or may
not, be able to prove at trial."  *Id.*, at 313.  The Court noted
that an order denying summary judgment based on a
determination of "evidence sufficiency" does not present a
legal question in the sense in which the term was used in
*Mitchell*, the decision that first held that a pretrial order
rejecting a claim of qualified immunity is immediately
appealable.  *Johnson*, 515 U. S., at 314.  In addition, the
Court observed that a determination of evidence sufficiency
is closely related to other determinations that the trial
court may be required to make at later stages of the case.
*Id.*, at 317.  The Court also noted that appellate courts
have "no comparative expertise" over trial courts in mak-
ing such determinations and that forcing appellate courts
to entertain appeals from such orders would impose an
undue burden.  *Id.*, at 309–310, 316.

The District Court order in this case is nothing like the
order in *Johnson*.  Petitioners do not claim that other
officers were responsible for shooting Rickard; rather, they
contend that their conduct did not violate the Fourth
Amendment and, in any event, did not violate clearly
established law.  Thus, they raise legal issues; these issues
are quite different from any purely factual issues that the
trial court might confront if the case were tried; deciding
legal issues of this sort is a core responsibility of appellate

courts, and requiring appellate courts to decide such issues is not an undue burden.

The District Court order here is not materially distinguishable from the District Court order in *Scott* v. *Harris*, and in that case we expressed no doubts about the jurisdiction of the Court of Appeals under §1291. Accordingly, here, as in *Scott*, we hold that the Court of Appeals properly exercised jurisdiction, and we therefore turn to the merits.

## III
### A

Petitioners contend that the decision of the Court of Appeals is wrong for two separate reasons. They maintain that they did not violate Rickard's Fourth Amendment rights and that, in any event, their conduct did not violate any Fourth Amendment rule that was clearly established at the time of the events in question. When confronted with such arguments, we held in *Saucier* v. *Katz*, 533 U. S. 194, 200 (2001), that "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." Only after deciding that question, we concluded, may an appellate court turn to the question whether the right at issue was clearly established at the relevant time. *Ibid.*

We subsequently altered this rigid framework in *Pearson*, declaring that "*Saucier's* procedure should not be regarded as an inflexible requirement." 555 U. S., at 227. At the same time, however, we noted that the *Saucier* procedure "is often beneficial" because it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." 555 U. S., at 236. *Pearson* concluded that courts "have the discretion to decide whether that [*Saucier*] procedure is worthwhile in particular cases." *Id.*, at

242.

Heeding our guidance in *Pearson*, we begin in this case with the question whether the officers' conduct violated the Fourth Amendment. This approach, we believe, will be "beneficial" in "develop[ing] constitutional precedent" in an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense. See *Pearson*, *supra*, at 236.

B

A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. See *Graham* v. *Connor*, 490 U. S. 386 (1989); *Tennessee* v. *Garner*, 471 U. S. 1 (1985). In *Graham,* we held that determining the objective reasonableness of a particular seizure under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U. S., at 396 (internal quotation marks omitted). The inquiry requires analyzing the totality of the circumstances. See *ibid.*

We analyze this question from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* We thus "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*, at 396–397.

In this case, respondent advances two main Fourth Amendment arguments. First, she contends that the Fourth Amendment did not allow petitioners to use deadly force to terminate the chase. See Brief for Respondent 24–35. Second, she argues that the "degree of force was excessive," that is, that even if the officers were permitted to fire their weapons, they went too far when they fired as

many rounds as they did. See *id.*, at 36–38. We address each issue in turn.

1

In *Scott,* we considered a claim that a police officer violated the Fourth Amendment when he terminated a high-speed car chase by using a technique that placed a "fleeing motorist at risk of serious injury or death." 550 U. S., at 386. The record in that case contained a videotape of the chase, and we found that the events recorded on the tape justified the officer's conduct. We wrote as follows: "Although there is no obvious way to quantify the risks on either side, it is clear from the videotape that respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.*, at 383–384. We also wrote:

> "[R]espondent's vehicle rac[ed] down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up." *Id.*, at 379–380 (footnote omitted).

In light of those facts, "we [thought] it [was] quite clear that [the police officer] did not violate the Fourth Amendment." *Id.*, at 381. We held that a "police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing

motorist at risk of serious injury or death."[3]  *Id*., at 386.

We see no basis for reaching a different conclusion here. As we have explained *supra,* at ___, the chase in this case exceeded 100 miles per hour and lasted over five minutes. During that chase, Rickard passed more than two dozen other vehicles, several of which were forced to alter course. Rickard's outrageously reckless driving posed a grave public safety risk.  And while it is true that Rickard's car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase.  Less than three seconds later, Rickard resumed maneuvering his car.  Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse "in an attempt to escape."  Thus, the record conclusively disproves respondent's claim that the chase in the present case was already over when petitioners began shooting.  Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road.  Rickard's conduct even after the shots were fired—as noted, he managed to drive away despite the efforts of the police to block his path—

––––––––––

[3] In holding that petitioners' conduct violated the Fourth Amendment, the District Court relied on reasoning that is irreconcilable with our decision in *Scott*.  The District Court held that the danger presented by a high-speed chase cannot justify the use of deadly force because that danger was caused by the officers' decision to continue the chase. *Estate of Allen* v. *West Memphis*, 2011 WL 197426, *8 (WD Tenn., Jan. 20, 2011).  In *Scott*, however, we declined to "lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive so recklessly that they put other people's lives in danger," concluding that the Constitution "assuredly does not impose this invitation to impunity-earned-by-recklessness." 550 U. S., at 385–386.

underscores the point.

In light of the circumstances we have discussed, it is beyond serious dispute that Rickard's flight posed a grave public safety risk, and here, as in *Scott*, the police acted reasonably in using deadly force to end that risk.

2

We now consider respondent's contention that, even if the use of deadly force was permissible, petitioners acted unreasonably in firing a total of 15 shots. We reject that argument. It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended. As petitioners noted below, "if lethal force is justified, officers are taught to keep shooting until the threat is over." 509 Fed. Appx., at 392.

Here, during the 10-second span when all the shots were fired, Rickard never abandoned his attempt to flee. Indeed, even after all the shots had been fired, he managed to drive away and to continue driving until he crashed. This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened.

In arguing that too many shots were fired, respondent relies in part on the presence of Kelly Allen in the front seat of the car, but we do not think that this factor changes the calculus. Our cases make it clear that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman* v. *United States*, 394 U. S. 165, 174 (1969); see also *Rakas* v. *Illinois*, 439 U. S. 128, 138–143 (1978). Thus, the question before us is whether petitioners violated Rickard's Fourth Amendment rights, not Allen's. If a suit were brought on behalf of Allen under either §1983 or state tort law, the risk to

Allen would be of central concern.[4]  But Allen's presence in the car cannot enhance Rickard's Fourth Amendment rights.  After all, it was Rickard who put Allen in danger by fleeing and refusing to end the chase, and it would be perverse if his disregard for Allen's safety worked to his benefit.

## C

We have held that petitioners' conduct did not violate the Fourth Amendment, but even if that were not the case, petitioners would still be entitled to summary judgment based on qualified immunity.

An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "'clearly established'" at the time of the challenged conduct. *Ashcroft* v. *al-Kidd*, 563 U. S. ___, ___ (2011) (slip op., at 3).  And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at ___ (slip op., at 9).  In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.*  In addition, "[w]e have repeatedly told courts . . . not to define clearly established law at a high level of generality," *id.*, at

———————

[4] There seems to be some disagreement among lower courts as to whether a passenger in Allen's situation can recover under a Fourth Amendment theory.  Compare *Vaughan* v. *Cox*, 343 F. 3d 1323 (CA11 2003) (suggesting yes), and *Fisher* v. *Memphis*, 234 F. 3d 312 (CA6 2000) (same), with *Milstead* v. *Kibler*, 243 F. 3d 157 (CA4 2001) (suggesting no), and *Landol-Rivera* v. *Cruz Cosme*, 906 F. 2d 791 (CA1 1990) (same).  We express no view on this question.  We also note that in *County of Sacramento* v. *Lewis*, 523 U. S. 833, 836 (1998), the Court held that a passenger killed as a result of a police chase could recover under a substantive due process theory only if the officer had "a purpose to cause harm unrelated to the legitimate object of arrest."

___ (slip op., at 10), since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. We think our decision in *Brosseau* v. *Haugen*, 543 U. S. 194 (2004) (*per curiam*) squarely demonstrates that no clearly established law precluded petitioners' conduct at the time in question. In *Brosseau*, we held that a police officer did not violate clearly established law when she fired at a fleeing vehicle to prevent possible harm to "other officers on foot who [she] believed were in the immediate area, . . . occupied vehicles in [the driver's] path[,] and . . . any other citizens who might be in the area." *Id.*, at 197 (quoting 339 F. 3d 857, 865 (CA9 2003); internal quotation marks omitted). After surveying lower court decisions regarding the reasonableness of lethal force as a response to vehicular flight, we observed that this is an area "in which the result depends very much on the facts of each case" and that the cases "by no means 'clearly establish[ed]' that [the officer's] conduct violated the Fourth Amendment." 543 U. S., at 201. In reaching that conclusion, we held that *Garner* and *Graham*, which are "cast at a high level of generality," did not clearly establish that the officer's decision was unreasonable. 543 U. S., at 199.

*Brosseau* makes plain that as of February 21, 1999—the date of the events at issue in that case—it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger. We did not consider later decided cases because they "could not have given fair notice to [the officer]." *Id.*, at 200, n. 4. To defeat immunity here, then, respondent must show at a minimum either (1) that the officers' conduct in this case was materially different from the conduct in *Brosseau* or (2) that between February 21, 1999, and July 18, 2004, there emerged either "'controlling authority'" or a "robust 'consensus of cases of persuasive authority,'" *al-Kidd, supra*, at ___ (slip op., at 10) (quoting *Wilson*

v. *Layne*, 526 U. S. 603, 617 (1999); some internal quota-
tion marks omitted), that would alter our analysis of the
qualified immunity question. Respondent has made nei-
ther showing.

To begin, certain facts here are more favorable to the
officers. In *Brosseau*, an officer on foot fired at a driver
who had just begun to flee and who had not yet driven his
car in a dangerous manner. In contrast, the officers here
shot at Rickard to put an end to what had already been a
lengthy, high-speed pursuit that indisputably posed a
danger both to the officers involved and to any civilians
who happened to be nearby. Indeed, the lone dissenting
Justice in *Brosseau* emphasized that in that case, "there
was no ongoing or prior high-speed car chase to inform the
[constitutional] analysis." 543 U. S., at 206, n. 4 (opinion
of Stevens, J.). Attempting to distinguish *Brosseau*, re-
spondent focuses on the fact that the officer there fired
only 1 shot, whereas here three officers collectively fired
15 shots. But it was certainly not clearly established at
the time of the shooting in this case that the number of
shots fired, under the circumstances present here, ren-
dered the use of force excessive.

Since respondent cannot meaningfully distinguish
*Brosseau*, her only option is to show that its analysis was
out of date by 2004. Yet respondent has not pointed us to
any case—let alone a controlling case or a robust consen-
sus of cases—decided between 1999 and 2004 that could
be said to have clearly established the unconstitutionality
of using lethal force to end a high-speed car chase. And
respondent receives no help on this front from the opinions
below. The District Court cited only a single case decided
between 1999 and 2004 that identified a possible constitu-
tional violation by an officer who shot a fleeing driver, and
the facts of that case—where a reasonable jury could have
concluded that the suspect merely "accelerated to eighty to
eighty-five miles per hour in a seventy-miles-per-hour

zone" and did not "engag[e] in any evasive maneuvers," *Vaughan* v. *Cox*, 343 F. 3d 1323, 1330–1331 (CA11 2003)—bear little resemblance to those here.

\*     \*     \*

Under the circumstances present in this case, we hold that the Fourth Amendment did not prohibit petitioners from using the deadly force that they employed to terminate the dangerous car chase that Rickard precipitated. In the alternative, we note that petitioners are entitled to qualified immunity for the conduct at issue because they violated no clearly established law.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*