KAREN LECRAFT HENDERSON, Circuit Judge,
concurring in the judgment:
I agree with my colleagues that the deputies are plainly entitled to qualified immunity. Maj. Op. 140. I further agree that our inquiry starts and ends with United States Supreme Court precedent. See Maj. Op. 138-39. But in my view, it is the Supreme Court’s more recent opinion in Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014), that controls Fenwick’s case. And, in contrast with Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), which speaks only to the second qualified-immunity — inquiry—“whether the deputies’ use of deadly force violated law that was clearly established at the time of the shooting,” Maj. Op. 137 —Plumhoff establishes that the deputies’ actions were “objectively reasonable in light of the facts and circumstances confronting them.” Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C.Cir.1993) (internal quotation marks omitted). Accordingly, their actions did not violate Fenwick’s Fourth Amendment rights at all.
In Plumhoff, a police officer stopped Rickard’s car because one of the headlights was out. 134 S.Ct. at 2017. Rick-ard appeared nervous and could not produce his driver’s license on request so the officer asked him to step out of the car. Id. Instead of complying, Rickard accelerated the car and led police on a high-speed chase. Id. During his attempted escape, Rickard repeatedly caused “contact to occur” between his car and police cruisers. Id. (brackets omitted). Eventually, Rick-ard found his car penned in by police cruisers but he continued to “us[e] the accelerator” in an attempt to escape. Id. At that point — and even though Rickard’s car “came temporarily to a near standstill,” id. at 2021 — an officer fired three shots into his car. Id. at 2017. Rickard “then reversed in a 180 degree arc and maneuvered onto another street, forcing [another officer] to step to his right to avoid the vehicle.” Id. (internal quotation marks omitted). And then, after Rickard’s car had passed the officer and Rickard “continued fleeing,” officers “fired 12 shots toward Rickard’s car, bringing the total number of shots fired during th[e] incident to 15.” Id. at 2018 (internal quotation marks omitted). Rickard and his passenger were killed. Id.
The Supreme Court held that the officers were shielded by qualified immunity because the officers’ use of deadly force “did not violate the Fourth Amendment.” Id. at 2022. The Court reached this conclusion because “Rickard’s outrageously reckless driving posed a grave public safety risk,” id. at 2021, and when the officers *141 opened fire, the only thing “a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road.” Id. at 2022. Moreover, the Supreme Court held that firing 15 shots — 12 of which occurred after Rickard had maneuvered past officers and “continued fleeing,” id. at 2018 (internal quotation marks omitted) — was reasonable. because, “if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.” Id. at 2022.
Although Fenwick’s case lacks the drama of the highspeed chase in Plumhojf, the factual differences between Plumhojf and Fenwick’s case do not make the former inapposite. Rather, the principle animating Plumhojf is dispositive here. As the district court, in summarizing the relevant portion of the superior court’s findings, put it, Fenwick “created a grave risk of causing significant bodily injury to Deputy Pudimott when, without justifiable or excusable cause, he drove the car forward in a manner that put the deputy in danger of being hit.” Fenwick v. United States, 926 F.Supp.2d 201, 215 (D.D.C.2013). Based on the “grave public safety risk” that Fenwick created, Plumhojf establishes that the deputies “acted reasonably in using deadly force.” 134 S.Ct. at 2022.
My colleagues consider “the constitutional question” in this case to be “close.” Maj. Op. 136-37. But the “facts [that] weigh in Fenwick’s favor” are largely immaterial. Maj. Op. 138. My colleagues also find significant “the deputies’ concession” that they “fired on Fenwick only after the vehicle struck Pudimott, when Pudimott was no longer in the car’s path.” Maj. Op. 138 (emphasis in original). But under Plumhojf, once Fenwick threatened bodily injury to Pudimott, the deputies were not obligated to stop firing “until the threat ha[d] ended.” 134 S.Ct. at 2022. And nothing in the record demonstrates that a reasonable officer would have concluded, in the few seconds that passed after Fenwick’s car struck Pudimott, that Fenwick was no longer dangerous.[1]
Nor does it matter that “the surveillance footage show[ed] no bystanders in the path of Fenwick’s car.” Maj. Op. 138. The Supreme Court has made plain that law enforcement officers may use deadly force to stop a suspect who poses “an actual and imminent threat to the lives of any pedestrians who might [be] present, to other civilian motorists, and to the officers involved,” Scott v. Harris, 550 U.S. 372, 384, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), and not only to protect civilians who, upon a post hoc review of security-camera footage, were in fact found to have been in the path of a fleeing suspect’s car. Here, the deputies had every reason to believe that civilians “might” be in harm’s way if the deputies did not neutralize the threat Fenwick’s reckless behavior posed. See id. As my *142 colleagues recognize, the deputies “observed pedestrians and vehicles close by in the minutes leading up to the shooting.” Maj. Op. 138.
We are, of course, bound to analyze the qualified-immunity question “from the perspective ‘of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.’ ” Plumhoff, 134 S.Ct. at 2020 (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). We must also “allo[w] for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.” Id. Although the videotape of the shooting “sheds almost no light on the shooting itself,” Maj. Op. 137, it plainly shows that the deputies had precious few seconds to decide how best to neutralize the threat Fenwick presented when he ignored the deputies’ commands and instead aimed his motor vehicle towards one of them. On these facts, the deputies’ actions were “objectively reasonable in light of the facts and circumstances confronting them,” Wardlaw, 1 F.3d at 1303 (internal quotation marks omitted), and I would hold that they are entitled to qualified immunity because they did not violate the Fourth Amendment.[2]

. My colleagues distinguish Plumhoff, in part, because the officers in that case resorted to deadly force only after they "sought to end the chase through non-lethal means.” Maj. Op. 136-37. But the Supreme Court has long held — indeed, since Tennessee v. Garner — that "[wjhere the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.” 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). To the extent the majority opinion implies that law enforcement officers must first try non-lethal means to neutralize a deadly threat or risk violating the Fourth Amendment, it is irreconcilable with a decades-long line of U.S. Supreme Court precedent. See Brosseau, 543 U.S. at 197-98, 125 S.Ct. 596 (quoting Garner, 471 U.S. at 11, 105 S.Ct. 1694).

. Although this point is necessarily incorporated in the body of my concurrence, to the extent that my colleagues’ statement that Pu-dimott and Fischer did not have "fair notice that [their] conduct was unlawful,” Maj. Op. 140, can be read as opining that the deputies’ conduct in fact violated the Fourth Amendment, I disagree.