NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0183n.06

CASE NO. 15-2192

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 24, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| THOMAS D. NOONAN, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| COUNTY of OAKLAND, *et al.*, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| *Defendants-Appellants*. | ) | |
| | ) | |

Before: SILER, BATCHELDER, and GRIFFIN, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** In this interlocutory appeal from the denial of qualified immunity, a police officer accused of malicious prosecution argues that she had probable cause and/or that the plaintiff was not deprived of his liberty. Because a plaintiff must have suffered a deprivation of liberty in order to state a Fourth Amendment claim of malicious prosecution under Sixth Circuit precedent, and because we cannot find a sufficient deprivation of liberty here, we conclude that this police officer is entitled to qualified immunity as a matter of law and REVERSE. We do not decide the fact-based question of probable cause.

**I.**

In June 2010, Thomas Noonan was an attorney earning over $100,000 per year at a law firm, where he had worked since 1999 and had become a partner in 2006. He had never declared bankruptcy, never been convicted of a crime involving theft or dishonesty, and never been arrested for or convicted of any drinking and driving violation. He had $10,000 in outstanding

student loans, toward which he was methodically paying $800 per month. He had once had an issue with the Michigan Bar, due to an isolated incident, long since resolved.

In 2008, Noonan had purchased a 2001 Pontiac Grand Prix from his brother, David, for $2,500. David gave Noonan only one key, an older style key without a fob or buttons. David later attested that he has no recollection of ever giving Noonan the second key and expressly denied that he told police that he gave Noonan two sets of keys with the vehicle at the time of the purchase. Noonan has insisted throughout this episode that he only ever had one key.

By June 2010, the car was almost 10 years old, with approximately 180,000 miles, and ordinary wear. Noonan had just replaced the brakes for $700 and he estimated the car's value at $1,000. R. 84-8 at 4. On the evening of June 17, 2010, Noonan left work around 7:00 p.m., went to the gym, and then met a friend at a bar to watch an NBA Finals game. After two or three drinks over the course of an hour and a half, Noonan left the bar a little after midnight and went home. On his way home, Noonan stopped and filled up his car with $42 in gas. Noonan parked his car in the driveway of his Farmington Hills home, as was his custom (he used his garage for storage), and left some personal property in the car, including gym clothes and several work-related files. Noonan locked the car and took his key into his house. He also took one of his two employment security access cards into his house with him. The next morning (June 18) at about 9:00 a.m., Noonan discovered that his car was gone. He reported a car theft to the Farmington Hills Police Department and to his insurance carrier. The responding officer noted "no sign of force"—presumably meaning no broken glass on the ground or other evidence of damage resulting from a physical break-in to the car—and that Noonan had the key. R. 84-8 at 4.

The Farmington Hills Police Department assigned the investigation to defendant Nicole Tomasovich-Morton, a detective with its Auto Theft Unit (ATU), a multi-jurisdictional task

force comprised of officers from Oakland County cities. Morton had been with the ATU since January 2010 (five months), before which she had no experience investigating auto thefts.

When the Detroit police recovered the car in Detroit at about 9:20 p.m. that evening (June 18), it was "w/o plate[,] … [k]eys were with the vehicle, and no arrest was made." R. 84-8 at 4. Detective Morton recorded in her Case Report [R.84-8] that, according to "Officer Pitts" of the Detroit Police Department, the driver had hit two parked cars and then abandoned the car and fled on foot—Morton's report, however, contains no name or description for the reporting witness and, more importantly, contains no description or request for description of the fleeing driver.[1]  Morton observed that "a temporary license plate" had been placed in the rear window and that the car had more damage than would be explained by the present accident. Morton noted that the key in the ignition was on a key ring with several other keys and a security pass card.

The key ring also had an individualized tag, which turned out to be for a "LegalShield" account for prepaid legal services.  Noonan's gym clothes and work files were still in the car and it was later reported that a tequila bottle (contents unreported) was found on the floor.  The police did not collect any fingerprints from the keys, the security pass card, the LegalShield tag, or the tequila bottle.  Nor did the police contact LegalShield to determine the owner of the tag— the prosecutor later recognized that it would be odd for an attorney such as Noonan to have a prepaid legal services account, and when Noonan's counsel subpoenaed LegalShield, the response provided a name and address for the account owner.  [R. 79]  It was not Noonan.

---

[1] This question—"How did the witnesses describe the fleeing driver?"—would have revealed that the witnesses had seen a skinny, African-American male.  Because Noonan is Caucasian, this would have precluded suspicion of him, and the investigation and prosecution that followed.  It is incomprehensible that Detective Morton, if she were conducting a legitimate investigation, would not have asked Officer Pitts this question. *Cf. Webb v. United States*, 789 F.3d 647, 662 (6th Cir. 2015) ("A law-enforcement defendant is deliberately indifferent—and therefore not entitled to qualified immunity—if he mistakenly identifies an individual as a suspect when the individual does not match the suspect's description.").

Detective Morton first interviewed Noonan on July 6, 2010, and her formal report begins with the characterization that Noonan "appeared to be very nervous, shaking, sweating and stumbling over his words." Noonan denies that characterization and asserts that he was instead calm and cooperative. Morton had Noonan describe any preexisting damage to the car and he recounted only a small dent to the rear bumper; she also had Noonan attest that he had only one key and she took possession of that key. Morton advised Noonan that his car had been recovered with a key in the ignition shortly after its theft and showed Noonan the key ring and keys found with the car. Noonan denied that the keys were his, even when pressed; though he did concede eventually that the security pass card "could be" one of his pass cards for work that he had left in his car. Noonan filled out a vehicle theft report and left his only key with Morton.

Two things warrant mention at this point. First, despite Noonan's claim that Detective Morton recorded both interviews [R.1 at 13], Morton said that she did not record the interviews or even keep her notes; indeed, she shredded her notes for all of the interviews in this case. Therefore, the only written record is her after-the-fact report. This is particularly important because two of Morton's proffered rationales for her suspicion are her claims that, during these interviews, Noonan changed his story and refused a polygraph. Morton claims that Noonan originally said that he went straight home from the gym and only later revealed that he went to a bar to watch the game. But Noonan denies ever saying that he had gone straight home, and there is no record of it in Morton's report. Morton also claims that Noonan refused to take a polygraph, but Noonan denies that Morton ever offered a polygraph and Morton's report contains no mention of any polygraph. The other noteworthy thing is that Morton lost the keys. She testified that she mailed them to the person who retrieved the car from the impound lot, but she could not recall who that was and she had no record of sending them. Also, contrary to

4

Farmington Hills Police Department rules, she did not photograph the keys as evidence. So there are no keys and no photos of the keys.

Morton interviewed Noonan again on July 21, 2010, and Oakland County Sheriff's Detective Herman Bishop attended this interview as well. Again, Morton's formal report begins with the almost identical characterization that Noonan "appear [sic] agitated and nervous[,] [s]haking and stumbling over his words." Noonan again denies that characterization and asserts that he was instead "very calm." Morton also claimed that "Noonan stated he just wanted to get this whole process behind him, he wanted it 'done'." Noonan denies that assertion and says he was glad to be getting his car back and that it had "been a pain in the ass borrowing cars."

Morton pressed Noonan about the keys and Noonan insisted that he had only one, that he had never copied it, and that nobody else had access to make a copy. Morton then reported: "Once Noonan learn[ed] that a car key was found in the ignition attached to a key chain with his work pass he stated that he could possibly have had a second key. Detectives then advised Noonan that both keys appear[ed] to be the original keys to the vehicle." R.84-8 at 6. But Noonan denies ever saying that he might or could have had two keys. Morton also reported that Noonan's brother David had told her "that he gave (Thomas) Noonan two sets of keys with the vehicle at the time of purchase." R. 84-8 at 6. David, however, denies this and says that while he told Morton that he himself had two sets of keys, he did not tell her that he gave both to Noonan, and that Noonan likely only had one (Morton kept no notes of this interview either). Finally, included without context or explanation in the report of this July 21 interview, Morton wrote:

> [Noonan] is also paying off his law school loans. He indicated that he is trying to get over the 'hump' with the loan. He wants the loan paid off as soon as he can.
>
> He planned on buying a new vehicle towards the end of the year. I asked Noonan what he planned on doing with the vehicle that was taken. Noonan paused and stated he was not sure.

R. 84-8 at 6. Morton had surmised that Noonan had two possible motives to falsify a police report and insurance claim, and the law school loan underlies the first: that Noonan wanted the insurance money to pay off his student loans. But Morton was already aware of other evidence that belies this theory: the amount of Noonan's outstanding loans (about $10,000), that he was current on those loans (at $800 per month), that his income was over $100,000 per year, that the car was only valued at $1,000, and that he would need to purchase another car.[2] But Morton and Detective Bishop nonetheless accused Noonan of pulling an "insurance scam job"; arranging the theft because he needed the money. When Morton produced a key and asked Noonan if it was the key he gave her at the July 6 interview, Noonan said that it looked like it, to which Morton replied that it was actually the key found in the car, suggesting to her that Noonan was lying. Because Detective Bishop had repeatedly asserted that the evidence "all points to [Noonan]," when they asked for a written explanation, Noonan declined and asked for a lawyer.

The day after the July 21 interview, Noonan retained counsel who immediately scheduled a polygraph with a private company run by a retired Michigan State Police polygraph examiner. In denying the car theft and the fraud, Noonan passed the polygraph. R. 84-10 (dated 7/25/10).

But based solely on her hunch that Noonan was lying about the theft of his car, Morton contacted the Oakland County Prosecutor on or about July 29, and urged her to charge Noonan. At her deposition, Morton offered her alternative suspicion as to Noonan's possible motive and testified that she suspected that Noonan "had been drinking prior to driving home . . . [a]nd, unfortunately, Noonan driving, hit something, fled the scene, and got home," leaving his car behind and then reporting it stolen. Lacking any evidence whatsoever to support that hunch, she offered three reasons for her suspicion. One was her insistence that Noonan had changed his

---

[2] Also, Noonan had just invested approximately $700 in that car to replace the brakes and had also, in April 2010, made a charitable donation of $2,500 to Cornerstone Schools. But nothing in the record demonstrates that Morton was necessarily aware of these two items at the time she prepared the report or posed this theory.

story about his whereabouts the night the car went missing, the possible existence of two keys, and his student loans, but her formal report says nothing about Noonan's ever changing his story and Noonan has consistently and emphatically denied ever doing so. The second was that Noonan was "shaking and stumbling over his words" but again Noonan pointedly denied that. And the third was Noonan's allegedly refusing a polygraph, which she claimed she omitted from her report because she had been instructed never to include reference to polygraphs in her police reports. Noonan responded that he was never offered a polygraph and therefore did not refuse one; moreover, he took and passed a privately administered polygraph and subsequently (after being charged) voluntarily took and passed another polygraph, administered by the police.

On July 29, 2010, the assistant prosecuting attorney (Amy S. McGregor) charged Noonan with two felonies: insurance fraud and falsely reporting a felony. In her case evaluation form, McGregor noted that Morton had told her that Noonan first "stated he only had one key" but "[t]hen stated he might have had two keys." R. 78 at 2. She also wrote, under "Further Investigation Requested," that she wanted to "Verify the key pass belongs to [Noonan] through his employer." As it turns out, that key pass did not belong to Noonan through his employer. But in her subsequent explanation for charging Noonan, McGregor concluded:

> The car key was found in the ignition. Also on the key ring was [Noonan]'s work key pass. [Noonan] could not provide any explanation for how that occurred. [Noonan] later said it was possible that he had two keys. Based on the fact that the key was found with the vehicle, nothing was taken from the car, and there was no interior damage to the vehicle, it is impossible for the theft to have occurred as [Noonan] stated, therefore he made a false report of a felony and a false report of a material fact to an insurance company for purposes of a claim.

R. 78. But as that key pass was not actually Noonan's, it is unclear why McGregor said it was, given her specific request to investigate and answer this, and there is no indication that McGregor made any attempt to "verify" the ownership of the key pass. It is possible that Morton told McGregor that it was Noonan's, but it is also possible that this was merely speculation or

7

mistake. Similarly, based on the record evidence and Noonan's testimony, Noonan never said that it was possible he had two keys.

Noonan's arraignment was on August 9, 2010, and it appears from the record that Noonan was not present. He was never physically arrested or incarcerated on these charges. He claims that he was compelled to attend a status conference in September, and that is not disputed.

On November 4, 2010, McGregor sought and obtained a nolle prosequi, thereby dismissing the charges. In the summary memo, McGregor explained:

> When [I] charged this case, [I] was informed that [Noonan]'s house/personal keys were on the keychain in the recovered vehicle along with his work 'swipe card,' said information tending to establish that the keys found in the ignition were [Noonan]'s commonly-used keys. Subsequently, [I] was informed that [Detective Morton] was unable to verify whose keys were on the key chain, and unable to verify if the swipe card actually belonged to [Noonan]

> [I] went to view the recovered car in the impound lot and viewed the keys on the key chain recovered from the vehicle's ignition. [I] noticed that on the key chain with several other keys was a small tag, which criminal defense attorneys give out to clients with their number on it to call if the client is in trouble. This information led [me] to believe these were *not* [Noonan]'s keys because [Noonan] is an attorney. Moreover, [I] noticed that the car was filled with [Noonan]'s personal items as well as boxes of work material. [I] also noticed a security key very similar to the one on the key chain was observed in the console area of the car. This was probably why [Noonan] believed it could have been his security swipe card on the key chain. The card is a white rectangle without unique identifiers.

> Upon being charged, [Noonan] asserted his innocence and requested a polygraph. A polygraph was approved and administered. The results of the test tend to establish that [Noonan] is not guilty of the charged offense….

> …

> List Reasons for Nolle Prosequi:

> 1) [Noonan] Passed Polygraph

> 2) Unable to prove the keys found in the car belonged to [Noonan]

> 3) Unable to prove the security swipe card found on the keychain in the recovered car belonged to [Noonan]

R. 78 at 2-3 (emphasis in original).

Noonan filed a § 1983 claim in federal court, accusing Morton of malicious prosecution.[3] In pressing his malicious prosecution claim, Noonan pointed to other evidence undermining any suspicion of him. Detective Morton herself testified that it is easy to get a re-key for a 2001 Pontiac Grand Prix. Detective Bishop testified that keys can be made from vehicle identification numbers for purposes of stealing cars and that it is not unusual to have cars stolen based on the copying of keys in this fashion. Sergeant Banycky testified that most car thefts in Farmington Hills happen in the south end of town, which is where Noonan lives.

Also, Morton and Bishop admitted that, other than interviewing Noonan, they performed no further investigation. For example, the Detroit Police reported that eyewitnesses had told them that someone had crashed the car and fled on foot. But there is no evidence that Morton obtained the actual reports by those officers or even asked for a description of the suspect. Morton claims that a few days into the investigation, she went to the Detroit neighborhood where the car was found but could not find the witnesses who spoke with the Detroit Police—she left her business card at some nearby houses but got no response. Years later, after being sued, Farmington Hills sent two different police officers to Detroit to find the witnesses, which they did. These witnesses told the officers that they remembered the incident well and had seen a skinny, African-American male run from Noonan's crashed car (Noonan is Caucasian). They also said the Detroit Police had apprehended the suspect, returned with him for them to identify, and then arrested him. 84-12 at 2. There is no evidence in the record of this arrest, however.

Noonan also points out that despite his denying ownership of the keys found in his car, Morton never investigated the LegalShield tag that was attached to the key chain, which had a

---

[3] Noonan also named Detective Bishop, but the district court granted Bishop summary judgment based, essentially, on his minimal participation. Noonan also sued Farmington Hills and Oakland County for municipal liability and the district court denied their motions for summary judgment. They have joined Morton's interlocutory appeal on the singular basis that the claims must fail if Morton is entitled to qualified immunity. Consequently, the only true issue here is Morton's qualified immunity and, therefore, that is the only issue we address.

clearly identifiable member number listed on it. But Noonan's lawyer did and quickly found its owner. Moreover, when the prosecutor viewed the car, she immediately spotted a second pass card—virtually identical to the one attached to the keys—in plain sight and realized that Noonan was probably confused when he indicated the pass card attached to the keys could have been his. Oddly, Morton never sought to reconcile the removal of the license plate and placement of a temporary tag in the rear window, with her theory that Noonan had abandoned the car (and his belongings therein) in a panic after an unexpected drunk driving accident.

Morton claimed qualified immunity and the district court set accurately out the standard for a Fourth Amendment malicious prosecution claim. A plaintiff must prove:

(1) a criminal prosecution was initiated against him and the defendant made, influenced, or participated in the decision to prosecute;

(2) there was a lack of probable cause for the criminal prosecution;

(3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty under the Fourth Amendment, apart from the initial seizure; and

(4) the criminal proceeding was resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). Only the second and third elements were at issue: Morton argued that she had probable cause to recommend prosecution and that Noonan did not suffer a deprivation of liberty. Morton pointed to several facts which, she argued, established probable cause, but Noonan had denied most of them as untrue and the court determined that if a jury were to believe Noonan rather than Morton, that jury could find a lack of probable cause. Moreover, Noonan had substantial other evidence, which—taken in the light most favorable to him—could further persuade a jury that there was no probable cause for charges here.

Morton also argued that Noonan suffered no deprivation of liberty because he was never arrested, incarcerated, or required to post anything other than a personal recognizance bond. But the district court held that, pursuant to *Bacon v. Patera*, 772 F.2d 259, 265 (6th Cir. 1985),

mandatory court appearances are sufficient to constitute a deprivation of liberty, as are the detrimental effects of a criminal investigation on his employment and income.

The district court denied qualified immunity, holding that "[e]ven if the [c]ourt believe[d] [Detective Morton]'s version of the facts, the question remains whether a jury could reasonably decide that Morton violated [Noonan]'s Fourth Amendment rights." The court also denied the City's and the County's motions for summary judgment based on Noonan's proffered evidence.

**II.**

This is an interlocutory appeal from a denial of a motion for summary judgment, in which Officer Morton argues that Noonan did not overcome her assertion of qualified immunity. To overcome a qualified immunity defense at the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. This means, at a minimum, pointing to "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986). If the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment.

The denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291 and is not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of . . . § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We may decide an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established. *Id.* We may also decide an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the

11

incontrovertible record evidence.  *See Plumhoff v. Rickard*, 572 U.S. --, 134 S. Ct. 2012, 2019 (2014); *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014).

The determinative question in this appeal is whether Noonan suffered a deprivation of his liberty and, as to this question, the facts are not in dispute. To state a claim for malicious prosecution under § 1983, a plaintiff must prove, among other things, that he suffered a deprivation of liberty protected by the Fourth Amendment. *Sykes*, 625 F.3d at 308-09.  Noonan contends that he did.  He asserts that the police called him in for questioning (twice) and he had to undergo a polygraph exam; he had to hire a criminal defense attorney; the court required him to attend a status conference; the police/prosecutor withheld his car from him, in impound, for over five months; and the false charges caused substantial embarrassment, personally and professionally, as he had to reveal this prosecution to his employer; all of which inhibited his practice as a lawyer and cost him thousands of dollars.  These facts are not in dispute.

Detective Morton argues that even though the prosecutor charged Noonan with two felonies, Noonan did not suffer a Fourth Amendment deprivation of his liberty.  He "was never arrested, incarcerated, or required to post anything other than a personal recognizance bond"; "did not have to stand trial before his charges were dismissed and, in fact, did not even have to participate in a preliminary exam"; nor was he "subjected to any travel restrictions as a result of the criminal charges"—"[t]o the contrary, he participated in a bike race that caused him to be in Chicago during the end of August and first part of September."  Apt. Br. at 28.

In finding a deprivation of liberty, the district court relied on *Bacon v. Patera*, 772 F.2d 259, 265 (6th Cir. 1985), in which we held that even though the plaintiff was not actually arrested, a summons to appear in court was a seizure sufficient to cause a Fourth Amendment deprivation of liberty.  Since that time, however, the Supreme Court has explained that a Fourth Amendment malicious prosecution claim is its own unique claim, *Albright v. Oliver*, 510 U.S.

266, 274 (1994), and we have specifically "articulated the elements of a Fourth Amendment malicious-prosecution claim under 42 U.S.C. § 1983," *Sykes*, 625 F.3d at 308, including:

> Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, *apart from the initial seizure.*

*Id*. at 308-09 (emphasis added) (quotation marks and citations omitted). That is, the initial arrest alone is an insufficient deprivation of liberty. *See Thibault v. Wierszewski*, No. 15-cv-11358, 2016 WL 3457941, at *11 (E.D. Mich. June 24, 2016) (explaining that the plaintiff "had to identify evidence that he was deprived of liberty *apart from* his arrest"). Given that a summons to appear is even less a deprivation than an arrest, it stands to reason that it too is insufficient to satisfy this third element of a Fourth Amendment malicious-prosecution claim under § 1983, pursuant to *Sykes*. Thus, we must reject *Bacon* from our current jurisprudence.

Rather, as most commonly applied in the Sixth Circuit, "[s]ervice with a summons to appear at trial or some other court proceeding does not rise to the level of a constitutional deprivation." *Billock v. Kuivila*, No. 4:11-cv-02394, 2013 WL 591988, at *6 (N.D. Ohio Feb. 14, 2013); *Briner v. City of Ontario*, No. 1:07-cv-129, 2011 WL 866464, at *4 (N.D. Ohio Mar. 9, 2011); *Hopkins v. Sellers*, No. 1:09-cv-304, 2011 WL 2173859, at *9–10 (E.D. Tenn. June 2, 2011); *see also Rapp v. Putnam*, 644 F. App'x 621, 628 (6th Cir. 2016) ("[E]ven if we assume that being subject to the authority of the court constitutes a Fourth Amendment seizure, defendants would still be entitled to qualified immunity because the particularized right alleged . . . is not clearly established." (quotation marks omitted)). Nor do we believe that the withholding of Noonan's car and the incurrence of defense costs satisfy the "deprivation of liberty" element as we have construed it, and we find no precedent that persuades us otherwise.

Noonan was never arrested or incarcerated, required to post bail or bond, or subjected to any travel restrictions. In short, despite the aggravation, financial cost, and personal humiliation

that Noonan suffered as a result of these false charges, we must conclude as a matter of law that he did not suffer a deprivation of liberty as understood in our Fourth Amendment jurisprudence.

While we sympathize with Noonan and condemn Detective Morton's conduct in almost every aspect of this case, we must nonetheless find her entitled to qualified immunity.

## III.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.