**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NEFTALI MONZON, individually, as Personal Representative of the Estate of Junef Ragadio Monzon; MARYLOU MONZON, individually, as Personal Representative of the Estate of Junef Ragadio Monzon,

*Plaintiffs-Appellants*,

and

JERICO REYES,

*Plaintiff*,

v.

CITY OF MURRIETA, a governmental entity; SCOTT MONTEZ; CHRIS ZELTNER; KYLE MIKOWSKI; ZACK BRADLEY; BLAKE WILLIAMS; DOES, 1–10,

*Defendants-Appellees.*

No. 19-55164

D.C. No. 2:17-cv-01371-RGK-SK

OPINION

Appeal from the United States District Court for the Central District of California R. Gary Klausner, District Judge, Presiding

Argued and Submitted March 31, 2020 Pasadena, California

Filed July 22, 2020

Before:  Consuelo M. Callahan, Kenneth K. Lee,
and Lawrence VanDyke, Circuit Judges.

Opinion by Judge VanDyke

**SUMMARY**[*]

### Civil Rights/Deadly Force

The panel affirmed the district court's summary judgment for defendants in an action alleging that police officers used unreasonable deadly force when they shot and killed Junef Monzon following a high-speed chase.

The panel held that that the officers' use of deadly force was objectively reasonable given the dynamic and urgent situation, where officers were faced with the immediate threat of significant physical harm.  The panel noted that first, the severity of Monzon's crime weighed in favor of the use of force.  Monzon led officers on a dangerous high-speed chase at night, and he refused to stop his van at the behest of officers even after coming to the end of a street.  Second, Monzon posed an immediate threat to the safety of the officers when he ignored commands to stop the van and drove near, toward, and amongst the officers on foot.  Third, Monzon's driving endangered the officers and left them with only seconds to consider less severe alternatives.  Finally, a

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

reasonable officer in the position of the individual defendant officers would have probable cause to believe that Monzon posed an immediate threat to the safety of one or more of the other officers or himself.

The panel held that even if the officers' use of deadly force was not reasonable on the uncontested facts of this case (which it was), the second prong of the qualified immunity analysis would still compel affirming the district court because the officers did not violate a clearly established right. The panel further rejected plaintiffs' claims that the City failed to train the officers, and plaintiffs' claims brought under state law.

**COUNSEL**

Marcel F. Sincich (argued) and Dale K. Galipo, Law Offices of Dale K. Galipo, Woodland Hills, California; Cameron Sehat, The Sehat Law Firm PLC, Irvine, California; for Plaintiffs-Appellants.

Daniel P. Barer (argued) and Anna L. Birenbaum, Pollak Vida & Barer, Los Angeles, California; Peter J. Ferguson and Allen Christiansen, Ferguson Praet & Sherman, Santa Ana, California; for Defendants-Appellees.

## OPINION

VANDYKE, Circuit Judge:

After leading police officers on a high-speed chase, Junef Monzon turned down a dead-end street.  He stopped at the end of the road, and the police officers parked and exited their cruisers behind him.  Monzon turned the van around, pointing it generally toward the officers.  As the van accelerated in an arc toward and eventually between the officers, they commanded Monzon to stop and fired on him when the van moved in their direction and in the direction of their fellow officers.  Monzon crashed into a police cruiser, pushing that cruiser into one of the officers, and the officers continued to fire.  Monzon sustained multiple gunshot wounds and was pronounced dead at the scene.

In granting summary judgment for the City of Murrieta ("the City"), the five police officers, and Does 1 through 10 (collectively "defendants"), the district court found that the officers' use of deadly force was reasonable.  Monzon's parents, Neftali and Marylou Monzon (hereinafter "plaintiffs" or "Monzon's parents"), appeal the ruling.  We hold that the officers' use of deadly force was objectively reasonable in this dynamic and urgent situation, where officers were faced with the immediate threat of significant physical harm.

## BACKGROUND

On October 22, 2016, at about 1:45 a.m., Officer Chris Zeltner ran the license plate of a Kia van and discovered the van was reported stolen.  Monzon was driving the van, and, unknown to Zeltner, Jerrico Reyes sat in the back of the van.  Zeltner informed dispatch that he planned to make a felony stop, and dispatch sent additional officers to assist him.

Zeltner attempted to pull Monzon over, but Monzon kept driving, leading Zeltner on a car chase. Officers Scott Montez, Kyle Mikowski, Zack Bradley, and Blake Williams joined Zeltner in the pursuit. Williams and Montez shared a cruiser, while Bradley and Mikowski drove separately. The officers testified that Monzon swerved back and forth on the freeway, drove at varied speeds up to 100 miles per hour ("mph"), exited and reentered the freeway, and ran stop signs and stoplights.

At about 1:57 a.m., Monzon turned onto a dead-end street with no lights. The five officers in four vehicles turned in behind him. They were alerted over the radio that the street came to a dead-end and to use precautions. The following chain of events occurred over an approximately two-minute period after the officers pulled onto the dead-end street behind Monzon.

Monzon stopped the van at the end of the street, and Zeltner stopped his cruiser behind Monzon near the van's rear bumper. Bradley staggered his vehicle behind Zeltner on the right side of the road. Mikowski stopped on the left side of the street behind Bradley. Williams and Montez staggered their vehicle behind and to the right of Mikowski's vehicle. Zeltner and Mikowski had activated the red and blue lights on their vehicles in addition to their headlights.

Shortly after the officers parked, Monzon engaged in a multi-point turn so that his vehicle was pointing back up the street he had just driven down, and generally in the direction of the five officers and their four parked vehicles. He ran into a fence post while turning, but it didn't stop him. While Monzon was turning, Zeltner exited his vehicle, presented his firearm, and shouted for Monzon to stop and put his hands in the air. Reyes, the passenger in the van, testified that Monzon put his hands in the air at this point, but Reyes

agreed that the van continued to turn and move forward. When the van was about 10 to 15 feet away from Zeltner, arcing near and around him in a counterclockwise motion, Zeltner fired his first shot at Monzon. As the van continued to move past Zeltner and toward the officers behind him, Zeltner fired five more shots at Monzon, aiming through the driver's side window. The van passed to the left of Zeltner and his cruiser, headed in the general direction of the other officers and their vehicles.

Bradley had also exited his vehicle and moved toward the rear of Zeltner's cruiser as Monzon was turning his van around. About a second after Zeltner stopped shooting and the van accelerated past Zeltner and Bradley, the van continued turning toward Mikowski and Williams, who were now on foot on the driver's side of the third cruiser. Bradley fired multiple shots at Monzon when he saw the van driving toward Mikowski and Williams. The van turned so that, at least at one point, it was headed directly toward Mikowski and Williams, and then was headed for the gap between the second (Bradley's) and third (Mikowski's) cruisers. Missing the gap, the van struck Mikowski's cruiser, pushing it into Williams, who was standing near the rear driver's side window of the cruiser. The crash occurred with such force that Williams's arm went through the cruiser's window, injuring him. Williams fired 10 shots at Monzon. Mikowski also fired seven shots at Monzon aiming through the passenger side window and front windshield. Stopped, the van's engine revved and its tires spun. Believing the van could drive over Mikowski or Williams, Bradley fired one more shot. Montez also fired.

The entire time from when Monzon started moving toward the officers to when the van crashed into the cruiser was 4.5 seconds. During that brief period, the van

accelerated repeatedly, with the accelerator pedal pushed from 84 to 99 percent, and reached a maximum speed of 17.4 mph. Although no officer gave a deadly force warning, it is undisputed that at least Officer Zeltner yelled "Stop!" before firing.

Once the van's engine stopped revving, it slowly rolled backwards until Zeltner stopped it by jamming a skateboard under its tire. The officers again commanded Monzon to show his hands. When Monzon did not respond, Mikowski deployed a canine. The dog jumped into the van and bit Monzon on the head and right arm before being disengaged by Mikowski. About 20 seconds elapsed between the time that the canine was deployed and disengaged. The officers then discovered Reyes in the back of the van. They called for medical assistance and performed chest compressions on Monzon until the paramedics arrived. Monzon, who had been shot eight times, was pronounced dead at the scene.[1]

## PROCEDURAL HISTORY

Monzon's parents and Reyes filed suit under 42 U.S.C. § 1983, contending that the officers and Does 1 through 5 violated Monzon's and Reyes' respective Fourth Amendment rights by using excessive force resulting in an unreasonable seizure and by denying Monzon medical care.[2] They also sought to hold Does 6 through 10 and the City

---

[1] Five shots went through Monzon's upper right arm, and most of those bullets appeared to enter his body traveling from back to front. A sixth bullet went through Monzon's right arm and into his chest. The seventh gunshot went into his left chest. The eighth bullet went through his right thigh into his left leg.

[2] Plaintiffs refer to Does 1 through 5 as other unidentified City police officers.

liable for failing to train their employees and for ratifying an unconstitutional custom, practice, or policy.[3]   Defendants filed a motion for summary judgment on each of these claims, as well as pendent state-law claims of battery, negligence, and a violation of the Tom Bane Civil Rights Act ("Bane Act"), California Civil Code Section 52.1.

The district court granted the motion for summary judgment on all claims, finding that the use of deadly force was objectively reasonable under the circumstances. Monzon's parents appealed the district court's order. Reyes did not appeal. As a result, our attention centers on the officers' conduct toward Monzon.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *United States v. Phattey*, 943 F.3d 1277, 1280 (9th Cir. 2019). In reviewing a grant of summary judgment, we view genuinely disputed facts "in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). We also determine "whether the district court correctly applied the relevant substantive law." *Phattey*, 943 F.3d at 1280 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)). To avoid summary judgment, the plaintiffs "must establish that there is a genuine issue of material fact" disputed by the parties. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

---

[3] Plaintiffs refer to Does 6 through 10 as unidentified managerial, supervisorial, and policymaking employees of the City police department.

## DISCUSSION

Because the officers have raised the affirmative defense of qualified immunity, plaintiffs cannot prevail on their federal claims unless the officers violated a clearly established constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights.") (internal quotation marks omitted). If they did not violate a constitutional right that was clearly established at the time of the events at issue in this case, then the "doctrine of qualified immunity protects" them "from liability for civil damages." *Id.* (quoting in part *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). While a case does not need to be squarely "on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted)).

But before considering whether the constitutional violation alleged by plaintiffs is "clearly established," we begin by determining whether the officers actually violated a constitutional right based on the record and plaintiffs' alleged facts. *Pearson*, 555 U.S. at 232. If we conclude that no constitutional right was violated, then no further analysis is required. Only if we conclude that the officers *did* violate a constitutional right would we then need to proceed to the

second step of the inquiry to decide if the constitutional right "was clearly established at the time of [the officers'] alleged misconduct." *Id.* (internal quotation marks omitted).[4]

**I**

Because apprehending a suspect through the use of deadly force is considered a Fourth Amendment seizure of the person, we must determine if the officers acted in an objectively reasonable manner when they "seized" Monzon using deadly force or if they violated his right to be free from unreasonable seizures. *See Scott v. Harris*, 550 U.S. 372, 381 (2007); *Graham v. Connor*, 490 U.S. 386, 395–97 (1989).[5]  In determining reasonableness, the Supreme Court has instructed us to examine the "facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137–39 (1978) and *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  We must also view the specific use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  When "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  To assess reasonableness,

---

[4] This sequence of analysis can be flipped if it is easier to jump immediately to the question of whether an alleged constitutional right is "clearly established," without deciding whether a constitutional violation has actually occurred. *Pearson*, 555 U.S. at 236.

[5] "[T]he Fourth Amendment is enforceable against the States through the Fourteenth Amendment." *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967) (citing *Ker v. California*, 374 U.S. 23, 30 (1963)).

we consider the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396).

We are mindful that we must view the disputed evidence in favor of plaintiffs, and we do so. We accept that Monzon raised his hands in the air when ordered to do so by Zeltner (even though the van was indisputably moving and turning at that time). Likewise, we assume that Zeltner was up to 15 feet away from the van and was not in its direct path at the time he opened fire. And we accept that none of the officers gave a deadly force warning. On the other hand, we are also required to view the facts as an officer would have encountered them on the night in question, not as an ex post facto critic dissecting every potential variance under a magnifying glass. *See Graham*, 490 U.S. at 396. We thus cannot ignore that Monzon rebuffed Zeltner's initial attempt to perform a traffic stop and drove away at speeds of up to 100 mph, endangering the pursuing officers and the general public. We must also consider how Monzon recklessly exited and reentered the freeway, drove through stop signs and red lights, and steered the van near and toward officers (who were on foot) on the dark, dead-end street. Monzon drove near Zeltner, headed toward Mikowski and Williams, and then turned to where the van struck Mikowski's cruiser, pushing the cruiser into Williams. The officers fired at various times between when the van neared Zeltner up until and shortly after the van struck Mikowski's car.

We conclude that the officers' use of deadly force was reasonable under *Garner* and *Graham*. First, the severity of the crime weighs in favor of the use of force. Monzon led

officers on a dangerous high-speed chase at night, and he refused to stop the van at the behest of officers even after coming to the end of a street. Second, Monzon posed an immediate threat to the safety of the officers when he ignored commands to stop the van and drove near, toward, and amongst the officers on foot. These actions also demonstrate that Monzon was actively resisting arrest and attempting to evade arrest by flight.

Third, Monzon's driving endangered the officers and left them with only seconds to consider less severe alternatives. Judges and lawyers viewing an event like this in hindsight from the comfort of their armchairs are often tempted to dissect, evaluate, and second-guess the officers' actions piecemeal. That would be a serious mistake.[6] Cherry-picking specific facts in hindsight is not at all reflective of how this event transpired in real life. It all happened in less time than it took to type this sentence, before daylight, in a very dynamic and chaotic environment, where officers were forced to make split-second decisions about a driver who deliberately turned his car around and drove it toward and between them. The officers were faced with a reckless driver who had already endangered their lives and the lives of the public with a high-speed chase, had broken traffic laws, ignored commands to stop his vehicle, and steered and accelerated his van toward them in close quarters on an unlit street. Although we must read the record in the light most favorable to the plaintiffs, we do not—indeed, we cannot—

---

[6] *See Graham*, 490 U.S. at 396 (commanding courts to evaluate the reasonableness of deadly force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"); *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) ("[J]udges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.").

dissect the record in a way that ignores the totality of the dynamic and quickly changing circumstances Monzon created by deliberately turning his car around and driving it toward and between five officers.     Finally, we take note that the officers did not provide a deadly force warning.  But this fact is not determinative.  The urgency of this chaotic situation made a deadly force warning impractical because the van went from a standstill to crashing into a cruiser at over 17 mph in 4.5 seconds.  And assuming that Monzon put his hands up in the air, we cannot look at that fact in isolation and ignore the quickly changing situation.  The uncontested fact that Monzon was still driving and turning his car toward the officers while allegedly raising his hands in surrender (after having just hit a fence post and finishing a high-speed chase) must also be taken into account.  In that circumstance, it was objectively reasonable for the officers to believe that whatever else Monzon was doing, he was not surrendering. A reasonable officer in the position of Zeltner, Mikowski, Williams, Montez, or Bradley would have probable cause to believe that Monzon posed an immediate threat to the safety of one or more of the other officers or himself as Monzon drove his car toward and among the five officers.

The same is true with respect to the officers firing immediately after Monzon crashed the van into the cruiser. It is undisputed that the van crashed with enough force to push the cruiser into one of the officers, driving his arm though the cruiser's window.  Even though it was no longer moving, just as in *Wilkinson* these officers "could hear the engine revving" and they were now situated on all sides of a van containing "a driver desperate to escape," 610 F.3d at 552—so desperate, from their perspective, that he crashed his van, first into a fencepost, and then into one of their cars. It was not unreasonable for the officers in that situation to believe that Monzon, who had just seconds before crashed

the van into a fence post yet continued on, had to be stopped after this second impact before he drove the van into one of them. When "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. The officers did not violate a constitutional right when they fired on Monzon.

Plaintiffs argue that "[t]he dispositive disputed fact . . . is whether any officer was in the van's path when [the officers] fired." Even if this is a disputed fact, this fact is not material and therefore not "dispositive." We have never held that an officer *must* be in the *direct path* of a moving vehicle before his use of force is deemed reasonable. Nor could we, given the Supreme Court's opinion in *Plumhoff v. Rickard*, 572 U.S. 765 (2014). Rickard led officers on a high-speed chase reaching more than 100 mph and created "a grave public safety risk." *Id.* at 776. "And while . . . Rickard's car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase." *Id.* "Less than three seconds" after impact, "Rickard resumed maneuvering his car." *Id.* "Just before the shots were fired . . . Rickard was obviously pushing down on the accelerator . . . 'in an attempt to escape.'" *Id.* When "the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight . . . [and] he would once again pose a deadly threat for others on the road." *Id.* at 777. Under these circumstances, "it is beyond serious dispute that Rickard's flight posed a grave public safety risk, and . . . the police acted reasonably in using deadly force to end that risk." *Id.* Even when officers were not in the direct path of the car, they were "justified in firing at a suspect in order to end a severe threat to public

safety." *Id.*[7]  Thus, an officer need not be in the direct path of a vehicle to use deadly force.

Like Rickard, Monzon created a grave public safety risk by fleeing from the police at speeds up to 100 mph and driving erratically.  But in addition to endangering the public safety, it is irrefutable that Monzon drove the van toward Mikowski and Williams just seconds before it turned and collided with Mikowski's cruiser.[8]  It is also undeniable that Monzon drove the van *between and amongst* the officers and their cruisers, so that when he eventually crashed into Mikowski's cruiser, the van was surrounded by officers on all sides.  Officers are permitted to use deadly force to protect the lives of other officers.  Here, where it is undeniable that Monzon drove his van amongst the officers and directly toward some of them, it does not matter whether Monzon drove the van toward *all* of the officers when the shooting began.  In this chaotic situation spanning a mere

---

[7] In contrast to plaintiffs' argument that officers must justify every shot, the Supreme Court in *Plumhoff* observed that "'if lethal force is justified officers are taught to keep shooting until the threat is over,'" and "officers need not stop shooting until the threat has ended." *Id.* at 777.

[8] As a matter of simple physics, Monzon's van was moving *directly toward* Mikowski and Williams at some point in the 4.5 seconds from when Monzon started moving to when he crashed into Mikowski's cruiser.  Plaintiffs acknowledge that Monzon's van was turning as it passed Zeltner.  At the beginning of the turn, the van was headed toward the dirt shoulder to the left of Mikowski and Williams.  When the van hit Mikowski's cruiser, it was headed to the right of the officers.  It is impossible for the van to have changed its trajectory from the *left* of the officers to the *right* of the officers without moving *directly toward* the officers at some point.  At the end of this turn, the van hit Mikowski's vehicle with enough force to push Williams's arm through the rear driver's side window of the cruiser upon impact.

4.5 seconds, the officers that Monzon did not drive directly toward were justified in using deadly force to protect the lives of their fellow officers that Monzon was driving toward. *See Wilkinson v. Torres*, 610 F.3d 546, 552–53 (9th Cir. 2010) ("[W]e conclude as a matter of law that deadly force was authorized to protect a fellow officer from harm.").

Viewing the facts in the light most favorable to Monzon does not undermine the claim that an officer in Zeltner's position had an objectively reasonable basis to feel threatened as the van turned and drove toward him and the other officers behind him.  Monzon raising his hands off the steering wheel while turning and moving his vehicle toward and between the officers, as plaintiffs contend he did, would, if anything, seem to be *extra* cause for alarm and concern. An officer might reasonably question the ability of any driver in this situation—much less one who has just driven erratically in a high-speed chase and run into a fence post while turning his car around—to safely navigate his accelerating vehicle between five police officers and four closely parked cars.  *See United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987) (per curiam) ("It is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon.").

The uncontested facts show that Monzon drove between and among five officers and hit the front and passenger side of Mikowski's car as he attempted to turn and exit the street. In these circumstances, a reasonable officer would have perceived a serious threat as a demonstrably erratic driver now veered toward him and his colleagues—with less than total control of his vehicle.  At this moment in time, Mikowski and Williams had an objectively reasonable basis to believe that their lives were threatened, and Bradley and

Montez had an objectively reasonable basis to believe that their fellow officers were at risk of being struck by the van turning in their direction. Plaintiffs' argument that Monzon was neither an immediate threat to anyone, nor was he resisting arrest when the shooting began, flounders on the undeniable objective facts in this case.

The case most akin to this one from our circuit is *Wilkinson*, wherein this Court found the officer's use of deadly force to be reasonable. 610 F.3d at 553. In *Wilkinson*, Officer Key confirmed that a minivan was stolen and pursued the suspect, who drove up to 10 mph over the speed limit. *Id.* at 548–49. Officer Torres quickly joined the chase and forced the minivan into a yard where it eventually struck a telephone pole and came to a stop. *Id.* at 549. Officers Key and Torres exited their patrol cars and walked up to the van, shouting at the driver to show his hands. *Id.* As Officer Key attempted to open the driver's side door, the driver reversed the van, and Officer Key hit the ground. *Id.* Believing that the van ran over Officer Key, Officer Torres shouted at the driver to stop and started shooting when the driver continued accelerating around him in the slippery yard. *Id.* The driver, Wilkinson, died from the gunshot wounds. *Id.* This Court found that Officer Torres acted reasonably because a "reasonable police officer confronting this scene could reasonably believe that the minivan posed a deadly threat to Key and himself." *Id.* at 553. Wilkinson did not yield to police sirens, ignored commands to stop the car, and placed officers at risk by turning in close proximity to the officers.

Like in *Wilkinson*, Monzon turned his car in close proximity to multiple officers on foot, some of whom were, at times, directly in the path of the car. While the level of acceleration and the maximum speeds reached by Monzon's

van are disputed by the parties, plaintiffs acknowledge that the van's black box "speaks volumes about what actually occurred." That evidence shows that Monzon accelerated from a full stop to 15 mph in one second (4.5 to 3.5 seconds before the crash), never braked, and was moving at least 25 feet every second when he ran the van into the police cruiser.[9] Moreover, like in *Wilkinson*, the officers were aware that the van headed in their direction could accelerate dangerously and without notice at any moment. Given the hazardous predicament Monzon had put them in, the officers' actions were reasonable.

Plaintiffs repeatedly emphasize the "slow" speed of the van, but this fact, taken as true, does not distinguish this case from *Wilkinson* because the minivan in *Wilkinson* was also not moving fast when the officers fired. *Id.* at 552 ("Although the vehicle was moving at a slow rate of speed because of the slippage, it could have gained traction at any time, resulting in a sudden acceleration in speed."). Here, it is undisputed that the van's event data recorder, or "black box," shows that the van's acceleration pedal was *repeatedly* pressed down between 80 and 99 percent during the very short 4.5 seconds from start to impact, and the van reached a speed of over 17 mph before hitting Mikowski's cruiser. Just like Rickard accelerated after a temporary stop in *Plumhoff*, Monzon was obviously accelerating. *See Plumhoff*, 572 U.S. at 776. And even a van traveling at only 10 mph moves approximately 15 feet *every* second, which is

---

[9] Plaintiffs acknowledge that Monzon's van accelerated to at least 16 mph one second before crashing into Mikowski's cruiser. And the black box data that plaintiffs rely on tells us that the van was traveling at 17.4 mph at the time of impact.

significant when a van that has been driven erratically is moving in close proximity to officers.

The use of deadly force here, although tragic, was not unreasonable.  *See Plumhoff*, 572 U.S. at 776–77; *Graham*, 490 U.S. at 397–99; *Garner*, 471 U.S. at 11.  Monzon endangered the general public by fleeing from officers at speeds up to 100 mph and breaking several traffic laws along the way.  Then he drove to the end of a road and threatened the lives of officers on foot by accelerating the van among them, like in *Wilkinson*.  The officers acted reasonably in using deadly force to end the grave risk that Monzon posed to the officers near the van.  While *Plumhoff* instructs us that Monzon's reckless, high-speed driving posed a severe threat to public safety that may itself have justified the use of deadly force, we need not reach that issue because here the use of deadly force was reasonable to protect the officers whose lives were threatened by the accelerating van.

## II

Likewise, the officers did not use excessive force when they deployed a canine to physically apprehend Monzon after the shooting.  After being cornered at the end of a dead-end street, Monzon had just turned his vehicle around, driven it toward and between five police officers, and ran his vehicle into a police cruiser.  Under those circumstances, it was reasonable for the officers to be concerned that, even though the van was now stopped, Monzon might resist arrest or attempt to drive the van away again.  If an officer had personally reached through the van door to apprehend Monzon—instead of using a canine—and Monzon reacted by trying to drive away, the officer would be in danger of getting caught in the doorway of the van just as in *Wilkinson*. 610 F.3d at 549 (describing the suspect reversing the vehicle as the officer attempted to open the driver's side door).  The

officers stopped the dog from subduing Monzon within a reasonably short period of time (about 20 seconds after the dog was released) once it was clear Monzon was not resisting. *See, e.g.*, *Lowry v. City of San Diego*, 858 F.3d 1248, 1256–57 (9th Cir. 2017) (en banc) (determining that the use of force was not excessive when a dog's encounter with the suspect was brief and closely followed by an officer).

### III

Because none of the officers violated a constitutional right, "we need not reach the question of whether that right was clearly established." *Wilkinson*, 610 F.3d at 554. But even if the officers' use of deadly force was not reasonable on the uncontested facts of this case (it is), the second prong of the qualified immunity analysis would still compel affirmance because the officers did not violate a clearly established right. To surmount the "clearly established" threshold, "a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and brackets omitted). In determining "whether the violative nature of *particular* conduct is clearly established," we examine the "specific context of the case." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate" before we can recognize that a right is clearly established. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

It is not enough to claim that officers had "fair warning [based on] the general tests set out in *Graham* and *Garner*." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Those cases, "following the lead of the Fourth Amendment's text, are cast

at [too high a] level of generality." *Id.* Instead, the law must be clearly established in a "particularized" sense, *id.*, and the conduct must fall outside the "hazy border between excessive and acceptable force." *Id.* at 201 (internal quotation marks omitted).

Monzon ignored an officer's attempt to make a traffic stop just before 2:00 a.m., led officers on a high-speed chase, ignored officers' commands to stop his vehicle, turned his van toward at least two officers on foot after he reached the dead-end of an unlit street, accelerated his car up to 17 mph in just a few seconds, and crashed his car into an officer's cruiser. The officers employed deadly force as the van accelerated near and among them on the street. The parties present no cases, and we have found none, holding that police officers have violated a clearly established right by using deadly force in a similar context. In contrast, this Court's opinion in *Wilkinson v. Torres* cuts against any argument that a constitutional violation was clearly established at the time of the incident. In *Wilkinson*, the use of deadly force did not violate a constitutional right because the officers "had probable cause to believe that the threat to safety justified the use of deadly force." *Wilkinson*, 610 F.3d at 551. The same is true here. There is no existing precedent that would clearly put a reasonable officer on notice that using deadly force against Monzon under the circumstances of this case would violate Monzon's rights. Therefore, the plaintiffs could not overcome qualified immunity even if the officers acted unreasonably.

Plaintiffs ask us to rely on other cases where an officer's actions were not deemed reasonable. Those cases, however, are not similar to this one, and none go beyond reinforcing the general tests set forth in *Graham* and *Garner*.

In *Adams v. Speers*, for example, Alan Adams refused to pull over for a traffic stop but drove "largely within the speed limit, stopp[ed] at some stop signs[,] and roll[ed] slowly through others" while being followed by the police. 473 F.3d 989, 991 (9th Cir. 2007). Nevertheless, Officer Speers rammed Adams' car and forced it down a steep sandy embankment where officers quickly boxed it in. *Id.* at 991–92. After another officer broke Adams' driver side window to pepper spray him, Officer Speers got out of his car, stood in front of Adams' car, and shot Adams while his car slowly rolled *away* from the officers. *Id.* at 992. Here, Monzon led the officers on a classic high-speed chase, reaching speeds of up to 100 mph, and while in close quarters steered the van in the direction of and among officers on foot, crashing the van into a police car. *Adams* is a very different case.

Plaintiffs raise *Gonzalez v. City of Anaheim*, 747 F.3d 789, 792 (9th Cir. 2014) (en banc), which involved the use of deadly force by an officer who was *inside* the car with the suspect after a traffic stop, and the suspect began to drive away. It is not even superficially similar to this case. None of the officers here were inside the car with Monzon; rather, Monzon was driving his car *toward* the officers. Likewise, *A.D. v. California Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013), is not similar. There, an officer began firing on the suspect even though no officers were in the path of the suspect's car and no other officers felt threatened by the car. And in *Acosta v. City and County of San Francisco*, an off-duty officer pursued two suspects until he saw them get into a waiting car, at which point he shot and killed the driver. 83 F.3d 1143, 1144 (9th Cir. 1996), *abrogated by Saucier v. Katz*, 533 U.S. 194 (2001). Unlike the brief encounter that led to Acosta's death, the officers in this case attempted a traffic stop, witnessed the dangerous and illegal driving of Monzon from the freeway to the dead-end street, and only

fired when Monzon turned the van in their direction, accelerated toward them, and threatened their safety.

Plaintiffs also point to a Second Circuit opinion, *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2d Cir. 2003), that they claim contains "the dispositive fact" of the suspect's vehicle "traveling slowly and that the officer was not in the vehicle's path, but off to the side." But *Cowan* does not assist our analysis. The officer in *Cowan* pulled over a vehicle with two occupants, discovered a potentially illegal substance, attempted to arrest the driver, and chased the driver into the woods after he ran away on foot. *Id.* at 758. Upon the officer's return to the highway (without the suspect in custody), the officer saw the second occupant driving the vehicle, and the officer fired twice—the second shot was fatal. *Id.* The plaintiff presented evidence that the officer fired when he was not in the car's path, the vehicle was moving slowly, the vehicle did not make any "sudden turns," and the officer (or anyone else) may not have been in danger when he fired. *Id.* at 763. So the evidence in *Cowan* suggested that the officer was not in danger when he employed deadly force, and it does not appear that anyone else was in danger. Here, the van was traveling toward some of the officers at up to 17 mph—25 feet every second. This imminently violent encounter with officers came after a high-speed chase wherein Monzon violated traffic laws and endangered the pursuing officers as well as the public safety. *Cowan* did not involve the grave risk to officers or the public safety that existed here.

*Wilkinson* remains the closest on-point case. And it weighs in favor of qualified immunity. While a case need not be "directly on point" to strip the officers of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate."

*Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). Here, the officers acted reasonably under the circumstances. But even if they had not, existing precedent does not show that the officers were "plainly incompetent or . . . knowingly violate[d] the law" when they employed deadly force. *Id.* (internal quotation marks omitted).

# IV

The district court granted summary judgment in favor of defendants with respect to each of the plaintiffs' six claims—three 42 U.S.C. § 1983 claims and three state law claims. Because the officers' use of deadly force was objectively reasonable, the district court properly granted summary judgment.

Seeing that the plaintiffs did not "specifically and distinctly" brief their § 1983 denial of medical care claim against the officers or their *Monell* claim against the City, they have waived both claims. *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief."); *see also Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) (stating that "matters on appeal that are not specifically and distinctly argued in appellant's opening brief" will not usually be considered).

Even if plaintiffs had not waived their claim that the officers denied Monzon medical care under § 1983 when they did not provide him with rescue breaths, the claim would still fail. Officers are not compelled to administer "what hindsight reveals to be the most effective medical care for an arrested suspect." *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006). The officers promptly called for medical assistance once they secured Monzon and Reyes, and the ambulance arrived

within five minutes of the van finally coming to rest.  *See id.* at 1099 ("[W]e hold that a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.").  The officers did not unconstitutionally deny medical care.

Even if plaintiffs had not waived their § 1983 claim against the City, it would still fail.  The City cannot be held liable when no constitutional right was infringed.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (confirming that a City may be sued when an unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers").  Because the officers' reasonable use of deadly force did not violate a constitutional right, plaintiffs cannot demonstrate that a constitutional violation resulted from the policies or ordinances implemented, executed, or ratified by the City.

Plaintiffs' allegation that the City failed to train the officers in violation of § 1983 must similarly fail in the absence of unreasonable force.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (explaining that a failure to train claim requires the plaintiff to show a constitutional injury that could have been avoided through proper training).

Plaintiffs also raise state law claims of battery, negligence, and a violation of the Bane Act under California Civil Code Section 52.1.  None of these claims survive.

The battery claim fails because plaintiffs cannot show that the officers used unreasonable force.  *See Edson v. City of Anaheim*, 74 Cal Rptr. 2d 614, 616 (Cal. Ct. App. 1998) ("By definition then, a prima facie battery is not established

unless and until plaintiff proves unreasonable force was used."). The negligence claim fails because California law requires us to assess the reasonableness of the officers' actions looking at "the totality of [the] circumstances," and the officers here acted reasonably under the circumstances. *See Hayes v. County of San Diego*, 305 P.3d 252, 257 (Cal. 2013) (confirming that "California negligence law [assesses] the reasonableness of a peace officer's conduct . . . in light of the totality of circumstances"). Lastly, plaintiffs' Bane Act claim fails because the officers did not interfere or attempt to interfere with any constitutional rights using threats, intimidation, or coercion. *See Venegas v. County of Los Angeles*, 87 P.3d 1, 13–14 (Cal. 2004) (describing liability arising under California Civil Code Section 52.1); *see also Shoyoye v. County of Los Angeles*, 137 Cal. Rptr. 3d 839, 846 (Cal. Ct. App. 2012) ("A defendant is liable if he . . . interfered with or attempted to interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion.").

Because the officers acted in an objectively reasonable manner, summary judgment was properly granted to defendants with respect to the § 1983 claims and the state law claims.

## CONCLUSION

We **AFFIRM** the district court's grant of summary judgment in favor of defendants. Defendants' pending motion to strike is **DENIED** as moot.