**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH WILLIAMS,

*Plaintiff-Appellee*,

v.

CITY OF SPARKS; CHRISTOPHER BARE; CHRISTOPHER ROWE; MATEO TERRASAS; CHARLES COLBORN; NATHAN JANNING; VERNON TAYLOR; AUSTIN GIBSON,

*Defendants-Appellants*.

No.23-15465

D.C. No.
3:22-cv-00197-MMD-CSD

OPINION

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted March 7, 2024
Las Vegas, Nevada

Filed August 9, 2024

Before:  MILAN D. SMITH, JR., MARK J. BENNETT,
and DANIEL P. COLLINS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Excessive Force/Qualified Immunity

The panel reversed the district court's denial, on summary judgment, of qualified immunity to City of Sparks police officers in an action alleging, among other things, that the officers used excessive force when they shot plaintiff multiple times following a 42-minute car chase.

The panel first determined that it had jurisdiction over this interlocutory appeal because where, as here, defendants contend on appeal that the district court failed to review the facts in the light depicted in a video recording, they raise a question of law over which the appellate court has jurisdiction.

The panel next determined that the video evidence clearly contradicted plaintiff's claim that he was not attempting to accelerate once police officers blocked his truck with their police cars. Given the video evidence, the officers were entitled to qualified immunity on the excessive force claim because their actions were objectively reasonable. As in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), plaintiff posed a threat to the officers on the scene and the public at large. Plaintiff led officers on a chase that lasted forty-two minutes and reached speeds of around 70 miles per hour. During the chase, he ran several red lights, weaved between lanes, drove through a chain-link fence, drove in the wrong direction on the freeway, albeit briefly, and had, for a significant portion of the chase, his lights off and a blown

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

tire. By the time his truck was pinned, he had struck three patrol vehicles. As in *Plumhoff*, plaintiff continued his attempt to flee. Taking into account the duration, speed, and other hazards of plaintiff's flight, as well as his clear intent to flee, he posed a grave public safety risk and police acted reasonably in using deadly force to end that risk.

Exercising pendent jurisdiction over the *Monell* claims and the state battery claims, the panel held that the *Monell* claims failed as a matter of law because there was no constitutional violation in the officers' use of force, and the battery claim failed because the use of force was not unreasonable.

## COUNSEL

Dale K. Galipo (argued) and Benjamin S. Levine, Law Offices of Dale K. Galipo, Woodland Hills, California; Peter Goldstein, Law Offices of Peter Goldstein, Las Vegas, Nevada; for Plaintiff-Appellee.

Mariah Northington (argued) and Barrack Potter, Senior Assistant City Attorneys; Wesley K. Duncan, City Attorney; Sparks City Attorney's Office, Sparks, Nevada, for Defendants-Appellants.

# OPINION

M. SMITH, Circuit Judge:

This action stems from the non-fatal shooting of Plaintiff Joseph Williams by officers of the Sparks Police Department (SPD).  Williams filed suit against Defendants City of Sparks (the City) and several SPD officers,[1] asserting claims of excessive force, denial of medical care, municipal liability, battery, and negligence.  Defendants moved for summary judgment on all claims, arguing that the officers' use of deadly force was reasonable or, in the alternative, that the officers are entitled to qualified immunity.  The district court issued an order granting Williams's request to voluntarily dismiss his claim for denial of medical care and denying Defendants' motion for summary judgment on all remaining claims except the negligence claim.  Defendants appeal the portion of the district court's order denying summary judgment.  We reverse the denial of summary judgment as to each of the remaining claims.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 5, 2020, at around 12:10 AM, SPD dispatch received a 911 call from a gas station that a male suspect had stolen alcohol and was "vandalizing" a vehicle in the parking lot.  Dispatch requested an officer response for "larceny" and advised that the suspect did not appear to have a weapon. Officers Taylor and Colborn were dispatched, and Officer Colborn arrived at the gas station at approximately 12:14

---

[1] They are Officers Christopher Bare, Christopher Rowe, Mateo Terrasas, Charles Colborn, Nathan Janning, Vernon Taylor, and Austin Gibson.

AM. Officer Colborn pulled behind Williams's truck and activated his overhead lights. Williams fled in his truck.

Colborn pursued Williams with his siren and overhead lights active. Colborn radioed other officers about the pursuit, noting that Williams was driving between 30 and 45 miles per hour and that there was no pedestrian traffic on the road. At several points, Williams slowed his truck to a stop, waited briefly, and then continued fleeing. He also ran multiple red lights. During this time, SPD dispatch informed the officers of Williams's identity, residence, and criminal history of "battery with a deadly weapon and eluding."

Around four minutes into the pursuit, Williams drove his truck into a dead-end street and stopped his truck. The officers exited their patrol vehicles and shouted for Williams to step out of his vehicle and to keep his hands up. Williams refused to exit the vehicle. For over ten minutes, the officers attempted to reason with Williams and have him exit his vehicle. Williams began yelling at the officers, revved the engine of his truck, and drove through a chain-link fence to flee the area. The officers continued their pursuit of Williams.

The officers attempted a pursuit intervention (PIT) maneuver on Williams's truck as he turned onto a major road. His truck spun around and accelerated past the officers, turning back onto the major road. Williams continued fleeing the officers for several minutes. He ran two more red lights with his speed ranging from about 35 to 50 miles per hour. During this time, Colborn reported "no traffic" on the roads. Eventually, Williams ran a third red light and turned onto the freeway. The freeway had light traffic going in the opposite direction. Williams's speed ranged between 55 and 70 miles per hour.

The pursuit continued on or near the freeway for around twenty minutes. Officers deployed spike strips, which dispatch confirmed were "effective" in puncturing the front passenger tire of Williams's truck. Although still fleeing, Williams slowed down to about 50 miles per hour. Williams continued driving on the freeway, swerving between lanes at speeds of about 35 to 45 miles per hour. Officers attempted another PIT maneuver on Williams's truck, but it was unsuccessful. Williams exited the freeway and ran two stop signs before turning back onto the freeway. By that point in time, Williams was driving on a flat tire, without any lights on, and briefly on the wrong side of the freeway before crossing the dirt median onto the correct side. Colborn drove up to the rear driver side of Williams's truck but had to back off when Williams suddenly braked and turned toward Colborn's patrol vehicle. Colborn radioed in that Williams had "just tried to ram [him]." Williams continued driving, weaving between lanes and with sparks coming from the truck's punctured wheel. Officers then performed a successful PIT maneuver, causing the truck to spin around and enter the ditch separating eastbound and westbound traffic.

Williams continued driving, now in the direction of the officers. The rear passenger wheel of his truck ran over the hood of Colborn's patrol vehicle. Then, the back of his truck hit the front of Officer Bare's vehicle. Williams came to a stop once Officer Janning wedged his patrol vehicle underneath the truck, pinning it against Officer Terrasas's patrol vehicle. After Williams's truck stopped moving, Officer Gibson positioned his patrol vehicle next to Janning's, in front of and facing the truck. Williams was effectively boxed in by Janning, Gibson, and Terrasas.

The truck's engine then made a loud, continuous noise, and a cloud of dirt and debris formed near the back of the truck. Colborn, Gibson, Janning, Taylor, and Terrasas all exited their vehicles and shouted commands, including "Stop the car!", while firing dozens of rounds into the cabin of the truck. Gibson fired his rounds from behind the back bumper of his patrol vehicle; Janning fired his rounds from behind his patrol vehicle; Colborn fired his rounds from behind Williams's truck; Taylor fired his rounds while taking cover from behind his patrol vehicle; and Terrasas fired his rounds as he walked from his patrol vehicle toward the truck's rear passenger corner. The officers continued firing for approximately 14 seconds, during which Williams's engine continued making a loud noise. Several bullets struck and injured Williams. This ended the forty-two-minute chase.

The officers coordinated a plan to get Williams out of the truck. They tried first to deploy a 40-millimeter less-lethal foam launcher to punch out the truck's rear window. However, the window did not break. Terrasas then moved his patrol vehicle away from Williams's passenger door. Williams opened the passenger door, exchanged words with the officers, and lay down on the ground. Colborn placed Williams in handcuffs and checked where he had been hit. Expedited paramedics then arrived and transported Williams to the hospital.

On May 2, 2022, Williams filed this lawsuit, asserting seven claims against Defendants: (1) excessive force; (2) denial of medical care; (3) municipal liability for ratification; (4) municipal liability for inadequate training; (5) municipal liability for unconstitutional custom, practice, or policy; (6) battery; and (7) negligence. The claims all

stem from the officers' use of deadly force and additional 40-millimeter less-lethal foam rounds.

Defendants filed a motion for summary judgment involving all seven claims. On March 24, 2023, the district court issued an order which, in relevant part, denied summary judgment on all claims except the negligence claim.[2] The district court denied summary judgment on the excessive force claim and qualified immunity defense because there were genuine factual disputes about the threat Williams posed to the officers once they blocked his truck and whether he was attempting further flight. For substantially the same reason, the district court declined to reach Williams's excessive force argument concerning the number of lethal rounds fired, declined to reach Defendants' excessive force argument concerning the use of the 40-millimeter less-lethal foam launcher, and denied summary judgment on the battery and municipal liability claims. Defendants timely appealed the denial of summary judgment.[3]

## JURISDICTION AND STANDARD REVIEW

We have jurisdiction to review the denial of qualified immunity pursuant to 28 U.S.C. § 1291. The denial of summary judgment is usually not an immediately appealable final decision, but "that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014).

---

[2] Williams sought to voluntarily withdraw his Fourth Amendment denial of medical care claim. The district court construed his request as a motion for voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) and granted the motion.

[3] Williams did not attempt to cross-appeal any portion of the district court's order.

That is "because 'pretrial orders denying qualified immunity generally fall within the collateral order doctrine.'" *Estate of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021) (quoting *Plumhoff*, 572 U.S. at 772). Therefore, "in the qualified immunity context, we typically have jurisdiction over interlocutory appeals from the denial of summary judgment." *Id.* "We review the district court's conclusions regarding qualified immunity *de novo*" and "consider all disputed facts in the light most favorable to the nonmoving party." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017). "Although we 'assum[e] that the version of material facts asserted by the [plaintiff] is correct,' we may consider facts offered by the defendant that are 'uncontradicted by any evidence in the record.'" *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (alterations in original) (citations omitted).

Williams contends that the appeal is based only on factual disputes that are unreviewable on interlocutory appeal. We disagree. "While appellate review does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact, *any* issue of law, including the materiality of the disputed issues of fact, is a permissible subject for appellate review." *Hart v. City of Redwood City*, 99 F.4th 543, 548 (9th Cir. 2024) (internal quotation marks omitted). The Supreme Court has recognized that a genuine issue of fact does not exist where a party's assertion of fact is plainly contradicted by a video recording. *See Plumhoff*, 572 U.S. at 777 (stating, based on evidence captured by video cameras on police vehicles, that "the record conclusively disproves [the plaintiff's] claim"). We have noted the same. *See Hernandez v. Town of Gilbert*, 989 F.3d 739, 746 (9th Cir. 2021) ("[W]e are not required to accept a non-movant's version of events when it is clearly

contradicted by a video in the record." (cleaned up)).  Where, as here, defendants contend on appeal that the district court failed to review the facts in the "light depicted in the videotape," *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)), they raise a question of law over which we have appellate jurisdiction.

## ANALYSIS

## I.   Excessive Force Claim and Qualified Immunity

The doctrine of qualified immunity protects government officials from § 1983 liability "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "We may consider the two prongs of the qualified immunity analysis in any order." *Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011).  We begin with the first prong.

A police officer's application of deadly force to restrain a subject's movements "is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Accordingly, any such use of deadly force must be "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Supreme Court's decision in *Graham* identified several factors to consider when evaluating the strength of the government's interest in the force used: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  "The most important *Graham* factor is whether the suspect posed an

immediate threat to anyone's safety." *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).

These factors are not exclusive. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). We still must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Id.* (internal quotation marks omitted). "Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed." *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (internal quotation marks omitted). "With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available, so long as they act within a range of reasonable conduct." *Id.* (cleaned up).

When weighing these competing factors two key principles must be kept in mind. First, "'[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (quoting *Graham*, 490 U.S. at 396). Second, "'[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97).

**A. Whether the video evidence clearly contradicts Williams's claim that he was not attempting to accelerate**

At the heart of the parties' factual dispute is whether Williams was attempting to accelerate when the officers opened fire. The district court explained: "Crucial to Defendants' argument is . . . '[t]he fact the officers shot at [Williams] multiple times while he was actively attempting to run over an officer and flee'" (alterations in original). Williams contends that he "never attempted to flee after [his] truck came to a stop and was pinned in between two police vehicles."

Citing the body camera recordings from Colborn, Terrasas, Gibson, and Taylor, as well as the dash camera recordings from Colborn and Gibson, the district court determined that the video evidence did not clearly show that Williams was attempting to accelerate—"the thick cloud that formed during these crucial few seconds . . . affects the visibility such that one cannot clearly see what actually transpired." Accordingly, the district court construed the record in Williams's favor and assumed in its analysis that his truck tires were not spinning and that "the noise coming from the truck's engine was not a result of Williams trying to accelerate."

On appeal, Defendants argue that the district court erred by ignoring video evidence that clearly shows the tires spinning, citing the dash camera recording from Janning. Our review of the record confirms the same. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment."). Unlike the vantage points relied on by the district court, Janning's dash camera footage plainly depicts the rear tire of Williams's truck as he is being boxed in. The video shows white lettering on the side of the tire and then shows those letters begin to blur as the engine revs—a clear indication that the tire was spinning. The video also shows those letters reappearing as the tire stopped spinning, about a minute after the shooting stopped. The video thus "contradicts the version of the story" told by Williams about the seconds leading up to the shooting. *See id.* at 378; *see also id.* at 380–81 ("[The plaintiff's] version of events is so utterly discredited by the record that no reasonable jury could have believed him. The [c]ourt . . . should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."). Williams was clearly attempting to accelerate—and therefore attempting to flee—when the officers opened fire. Our analysis proceeds on that basis.[4]

## B.  Use of deadly force

The officers are entitled to qualified immunity on the excessive force claim concerning the use of deadly force because their actions were objectively reasonable.

The Supreme Court addressed a case with substantially similar facts in *Plumhoff*, which we find instructive. 572 U.S. at 776–77. There, the driver led officers on a chase that "exceeded 100 miles per hour and lasted over five minutes."

---

[4] Williams argues in the alternative that "Defendants never identified this portion of the video in their motion for summary judgment" and "therefore forfeited this argument below, then waived it by failing to argue plain error here" (emphasis removed). Williams is incorrect. Defendants cited to this portion of Janning's dash camera footage numerous times in the underlying summary judgment briefing.

*Id.* at 776.  Eventually, the driver's car collided with a police vehicle and came to a temporary standstill with its front bumper flush against a police cruiser.  *Id.*  Just before the officers fired into the vehicle, the driver "was obviously pushing down on the accelerator because the car's wheels were spinning."  *Id.*  Thus, "[u]nder the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the driver] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."  *Id.* at 777.  The Court determined that "the police acted reasonably in using deadly force to end that risk."  *Id.*

Williams posed a similar threat to the officers on the scene and the public at large.  He led officers on a chase that lasted forty-two minutes and reached speeds of around 70 miles per hour.  During the chase, Williams ran several red lights, weaved between lanes, drove through a chain-link fence, drove in the wrong direction on the freeway, albeit briefly, and had, for a significant portion of the chase, his lights off and a blown tire.  By the time his truck was pinned, he had struck three patrol vehicles.  As in *Plumhoff*, Williams continued his attempt to flee.  He "was obviously pushing down on the accelerator because the car's wheels were spinning."  *Id.* at 776.  It is reasonable that an officer, without the benefit of hindsight, might fear that Williams's truck would gain traction at any moment, maneuver out of the pin, and accelerate forward into traffic.[5]  Based on the

---

[5] Williams suggests that "it was clear that the truck was immobilized." But much of his argument relies on post hoc observation, including that Williams's truck remained stationary for the fourteen seconds when shots were fired and thereafter.  We do not find this reasoning persuasive. "The reasonableness of a particular use of force must be judged from the

engine revving and the tires spinning, Williams appeared "intent on resuming his flight" and would have "once again pose[d] a deadly threat for others on the road." *Id.* at 777.

At a minimum, two of the *Graham* factors weigh in Defendants' favor, including the "most important" consideration of "whether the suspect posed an immediate threat to anyone's safety." *Nehad*, 929 F.3d at 1132; *see Estate of Lopez*, 871 F.3d at 1005 (noting that another *Graham* factor is "whether the suspect is actively resisting arrest or attempting to evade arrest by flight" (cleaned up)). In line with the Supreme Court's reasoning in *Plumhoff*,[6] we hold that Williams—taking into account the duration, speed, and other hazards of his flight, as well as his clear intent to flee—"posed a grave public safety risk" and that "the police acted reasonably in using deadly force to end that risk." 572 U.S. at 777. That the district court identified disputes of fact as to other considerations, is immaterial. *See id.* (holding that police acted reasonably without analyzing other factors such as the severity of the crime at issue, whether proper warnings were given, or the availability of less intrusive force).

Nor was the number or duration of rounds fired excessive. "It stands to reason that, if police officers are

---

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 584 U.S. at 103 (cleaned up).

[6] The district court distinguished this case from *Plumhoff* on the basis that "Williams was not 'obviously pushing down on the accelerator'" and that "it is far from clear whether Williams 'never abandoned his attempt to flee' during the 15-second timeframe in which the Officers fired their dozens of rounds" (quoting *Plumhoff*, 572 U.S. at 776–77). As explained above, Williams was obviously attempting to accelerate. The district court erred by assuming otherwise.

justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* In other words, "if lethal force is justified, officers are taught to keep shooting until the threat is over." *Id.* Here, during the fourteen seconds when the shots were fired, Williams did not abandon his attempt to flee. The engine can be heard revving throughout, and the tires continued to spin and kick up dust. The question would be closer if, for example, Williams had taken his foot off the accelerator and officers nevertheless fired a second volley of shots. But that did not occur here. Even Williams concedes in his answering brief that "[t]here was no change in circumstances during the approximately 17 seconds from the time the truck was pinned in, the shooting occurred, and the shooting ended." Once Williams attempted to accelerate his vehicle, the officers did not need to risk their safety by first waiting to see if his attempt would be successful, and they acted reasonably in firing the immediate fourteen-second volley of shots in response to that effort. Having fired that initial volley, the officers then reasonably ceased firing, as Williams's further attempts at acceleration proved fruitless.

Because we find no constitutional violation in the officers' use of force, they are entitled to qualified immunity. We reverse the district court's denial of summary judgment on this claim.[7]

---

[7] Williams also argues that "[i]ntentionally firing the 40mm [foam rounds] and striking Williams constituted excessive force" because he "still posed no threat to officers." This argument fails because, as Defendants observe, Williams has presented no evidence that he was actually struck by a foam round.

## II. Municipal Liability and Battery Claims

*Monell v. Department of Social Services*, 436 U.S. 658, 690–95 (1978), "established that municipalities can be liable for infringement of constitutional rights, under certain circumstances." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019). "In particular, municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Id.* at 602–03. "A plaintiff must . . . show '*deliberate* action attributable to the municipality [that] directly caused a deprivation of federal rights.'" *Id.* at 603 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997)).

A municipality is not entitled to assert the defense of qualified immunity. *See id.* Thus, the jurisdictional rule that allows Defendants to seek interlocutory review of the denial of qualified immunity does not extend to the municipal liability claims. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1139 (9th Cir. 2018). Nevertheless, we may exercise pendent jurisdiction and "review an otherwise non-appealable ruling when it is '"inextricably intertwined" with . . . [an] order properly before us.'" *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1154 (9th Cir. 2018) (quoting *Meredith v. Oregon*, 321 F.3d 807, 812–13 (9th Cir. 2003)). This standard is met only when the issues are "(a) . . . so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Id.* (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1285 (9th Cir. 2000)).

We exercise pendent appellant jurisdiction over the *Monell* claims in this case because they are "inextricably intertwined" with the excessive force claim and qualified immunity defense.**[8]**  The *Monell* claims fail as a matter of law because we found no constitutional violation in the officers' use of force. *See Huskey v. City of San Jose*, 204 F.3d 893, 906 (9th Cir. 2000).  We therefore reverse the district court's denial of summary judgment on the municipal liability claims.

For substantially the same reason, we exercise pendent appellate jurisdiction over the state battery claim.  "Under Nevada law, police officers 'are privileged to use that amount of force which reasonably appears necessary,' and are liable only to the extent they use more force than reasonably necessary." *Tuuamalemalo v. Greene*, 946 F.3d 471, 478 (9th Cir. 2019) (quoting *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996)).  "The standard for common-law assault and battery by a police officer thus mirrors the federal civil rights law standard: Liability attaches at the point at which the level of force used by a peace officer exceeds that which is objectively reasonable under the circumstances." *Ramirez*, 925 F. Supp. at 691.  Because the officers' use of force was not unreasonable, the battery claim fails. *Cf. Monzon v. City of Murrieta*, 978 F.3d 1150, 1164 (9th Cir. 2020) (applying California law). Accordingly, we reverse.

---

[8] The district court denied summary judgment on the *Monell* and battery claims in light of the "triable issues of material fact" that precluded summary judgment on the excessive force claim.

## CONCLUSION

For the foregoing reasons, we reverse the district court's decision denying summary judgment on the excessive force, municipal liability, and battery claims and remand for proceedings consistent with this opinion.

**REVERSED and REMANDED.**